# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 13, 2001 Session

## STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-C-1834     Cheryl Blackburn, Judge**

———————————————

**No. M1999-00803-CCA-R3-DD - Filed May 31, 2001**

———————————————

Paul Dennis Reid, Jr. was found guilty by a jury of two counts of first-degree murder and one count of especially aggravated robbery. Reid's convictions stem from the execution style murders of two Captain D's employees and the especially aggravated robbery of one of the employees. The jury returned a sentence of death for each of the homicides based upon its finding of three aggravating factors, *i.e.*, (i)(2), prior violent felony; (i)(6), murder committed for the purpose of avoiding prosecution; and (i)(7), murder committed during commission of robbery. The Davidson County Criminal Court subsequently imposed a twenty-five-year sentence for the especially aggravated robbery conviction and ordered this sentence to be served consecutively to the two death sentences. In this appeal as of right, Reid presents numerous issues for our review, including (1) issues arising from suppressed evidence; (2) challenges to the selection of jurors; (3) the sufficiency of the convicting evidence; (4) the admission and exclusion of evidence at both the guilt and penalty phases; (5) the propriety of the prosecution's closing argument during the guilt phase; (6) the failure to instruct on lesser-included offenses; (7) the trial court's act of holding court into late hours of the evening without cause; (8) the admissibility in general and the introduction of specific victim impact evidence; (9) prosecutorial misconduct during closing argument; (10) the propriety of the jury instructions; (11) whether application of the (i)(7) aggravator violates State v. Middlebrooks; (12) the propriety of a twenty-five-year sentence for especially aggravated robbery; (13) the constitutionality of Tennessee's death penalty statutes; and (14) whether the sentences of death imposed by the jury are proportionate sentences. After a careful review of the record, we affirm Reid's convictions for two counts of first-degree murder and one count of especially aggravated robbery. Additionally, we affirm the imposition of the sentences of death and the accompanying sentence for especially aggravated robbery.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined; JAMES CURWOOD WITT, JR. filed a concurring opinion.

Jeffrey A. DeVasher, Assistant Public Defender (on appeal); C. Dawn Deaner, Assistant Public Defender, (at trial and on appeal); J. Michael Engle and David Baker, Assistant Public Defenders, (at trial), Nashville, Tennessee, for the Appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Kathy Morante, Tom Thurman, Roger Moore, Grady Moore, Assistant Attorney Generals, for the Appellee, State of Tennessee.

## OPINION

In February 1999, the Appellant, Paul Dennis Reid, Jr., was convicted, in the Davidson County Criminal Court, of two counts of first-degree murder in the execution style killings of twenty-five-year-old Steve Hampton and sixteen-year-old Sarah Jackson and of one count of especially aggravated robbery.[1] At the conclusion of the penalty phase of the trial, the jury found the presence of three aggravating circumstances, *i.e.*, (i)(2), the defendant had previously been convicted of a felony involving violence to a person; (i)(6), that the defendant committed the murder for the purpose of avoiding prosecution; and (i)(7), that the murder was committed while the defendant was committing a felony. Tenn. Code Ann. § 39-13-204(i)(2), (6), and (7) (1997). The jury further determined that the mitigating circumstances did not outweigh the aggravating circumstances and imposed sentences of death on each count. The trial court approved the sentencing verdict. At a separate sentencing hearing, the trial court imposed a sentence of twenty-five years for the especially aggravated robbery conviction and ordered the Appellant to serve this sentence consecutive to his sentences of death. In this appeal as of right, the Appellant presents for our review the following issues:

---

[1] On August 26, 1997, an indictment was returned by the Davidson County Grand Jury charging the Appellant alternatively with two counts of premeditated murder and two counts of felony murder arising from the deaths of Steve Hampton and Sarah Jackson and one count of especially aggravated robbery of Steve Hampton. The jury returned guilty verdicts as to all five counts. Upon the State's motion, the trial court merged the two counts of felony murder into the two counts of premeditated murder. We note that both premeditated murder and felony murder constitute first-degree murder, see Tenn. Code Ann. § 39-13-202(a)(1), (2) (1997); State v. Hurley, 876 S.W.2d 57, 58 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S. Ct. 328 (1994), as they are but alternate means by which the offense may be committed. Hurley, 876 S.W.2d at 58. Indeed, our supreme court has recognized that "[t]he perpetration of a felony, during which a homicide occurs, is the legal equivalent of premeditation, deliberation and malice." Strouth v. State, 999 S.W.2d 759, 768 (Tenn. 1999), petition for cert. filed, (Jan. 5, 2000) (Holder, J., concurring)(citation omitted). In a case involving a killing where the jury has found the defendant guilty under both theories of first-degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997); State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998). In the present case, the trial court entered one judgment of conviction as to each victim noting that the two counts merged with one another. Additionally, we acknowledge that a general verdict of guilty is sustainable if any one count in the indictment is sustained by the proof. See Tenn. Code Ann. § 40-18-111 (1997). Accordingly, proof of either felony murder or premeditated murder is sufficient to sustain the conviction.

I. Whether the trial court erred in denying the Appellant's Motions to Suppress the identification testimony of Michael Butterworth and Mark Farmer and the physical evidence seized from the Appellant's residence (Appellant's Issues I and II);

II. Whether the trial court properly controlled the selection of numerous jurors (Appellant's Issues III, V, VI, and VII);

III. Whether the evidence was sufficient to support the Appellant's convictions for the first-degree murders of Steve Hampton and Sarah Jackson and his conviction for especially aggravated robbery (Appellant's Issue XIV);

IV. Whether the trial court properly admitted testimony during the guilt phase of the trial (Appellant's Issues VIII, IX, and X);

V. Whether the State committed prejudicial error, at the guilt phase, by making improper comments during closing argument (Appellant's Issues XI and XII);

VI. Whether the trial court's failure to instruct on lesser-included offenses was error (Appellant's Issue XIII);

VII. Whether the trial court committed plain error by holding court into the late hours of the evening (Appellant's Issue XXVIII);

VIII. Whether the admission and exclusion of certain testimony during the penalty phase of the trial constituted error (Appellant's Issues XVIII, XIX, XX, XXI);

IX. Whether the introduction of victim impact evidence constituted error (Appellant's Issues XV, XVI, XVII, and XXIII);

X. Whether the application of the (i)(7) aggravator was appropriate when the jury found the Appellant guilty of felony murder (Appellant's Issue XXII);

XI. Whether the trial court properly instructed the jury as to mitigating factors (Appellant's Issue XXIV);

XII. Whether the twenty-five-year sentence imposed for especially aggravated robbery is excessive (Appellant's Issue XXVII);

XIII. Whether Tennessee's death penalty statutes are constitutional (Appellant's Issue IV); and

XIV. Whether the jury imposed an arbitrary and disproportionate sentence (Appellant's Issues XXV and XXVI).

Having carefully considered the Appellant's claims, we find no error of law requiring reversal. Accordingly, we affirm the Appellant's convictions, his sentence for especially aggravated robbery, and the imposition of the death penalty in this case.

**Background**

### A. Guilt Phase

On Sunday morning, February 16, 1997, sometime between 11:00 a.m. and noon, Sarah Jackson and Steve Hampton, two employees of a Captain D's restaurant in Nashville, were discovered dead lying face down on the floor inside the restaurant's walk-in cooler. Steve Hampton was the manager of the Captain D's restaurant located on Lebanon Road. Sarah Jackson was a high school student who worked part-time in the restaurant. The deaths were carried out in execution-style fashion. Jackson was shot four times in the head and once in the back. Two of the gunshot wounds to the head were superficial and the wound to the back did not strike any major organs or blood vessels. The medical examiner testified that Jackson may have been able to move if these were the first shots fired. However, the two wounds to the head incapacitated Jackson and caused her death. Hampton died as a result of two gunshot wounds to the back of the head and one in the back. Expert testimony suggested that both victims were lying on the floor when they were shot. The testimony further suggested, based on the blood patterns, that Jackson attempted to raise herself after she had been shot. The victims were killed with a .32 caliber weapon, which was probably a revolver. Seven thousand one hundred forty dollars, which included two hundred fifty dollars in coins, was taken during the robbery of the restaurant.

The Appellant was first developed as a suspect on June 12, 1997, after he was arrested in Cheatham County for attempting to kidnap the manager of a Shoney's restaurant. The police obtained the Appellant's fingerprints as well as his photograph from this encounter. It is this evidence which ultimately connected him to the robbery and murders at the Captain D's restaurant.

Hampton's driver's license, credit card, movie video rental card, insurance cards, birth certificate card, and his children's identification cards were subsequently found on the ground next to Ellington Parkway in Nashville, approximately 11.5 miles from the crime scene and 1.2 miles from the Appellant's residence. While the Appellant's fingerprints were not found at the scene, several unidentified prints were found. The Appellant's fingerprint, however, was found on Hampton's movie rental card. Several shoe prints were photographed on the floor near the safe inside the restaurant. The tread design of the shoe prints did not match any of the tread designs from the Appellant's shoes seized from his house; however, the length of the shoe print at the crime scene was consistent with the length of the Appellant's shoes.

The night before the murders, Sarah Jackson spent the night at the home of Steve Hampton and his family. Hampton's wife testified that they ate dinner and rented some movies from Movie

Gallery. When Hampton left for work at 6:00 a.m. on Sunday morning, he had approximately $600 in his wallet.

Michael Butterworth and Jason Carter, two employees of Captain D's working the night before the murders, testified that a man came into the restaurant sometime before closing time and inquired about a job application. The man said that he worked for Shoney's which was just down the road. Carter testified that the man asked if anyone would be at the restaurant on Sunday morning. Carter told the man Hampton would be there but that he would be busy until after lunch. Butterworth saw the man leave in a dark colored car.

During trial, both Carter and Butterworth identified the Appellant as the man who came into Captain D's the night before the murders. About a week after the murders, Butterworth, Carter and James Cassidy, another employee who was present the night before the murders, assisted in preparing a sketch of the man they saw. Butterworth stated that the man's hair was "pulled straight back." Butterworth did not include a moustache in his sketch. Carter stated that the man wore a ponytail but no moustache. The Appellant apparently, however, had a moustache at that time. In June 1997, the police showed Butterworth and Carter a photographic lineup of six individuals, including one of the Appellant. Butterworth could not make a positive identification at that time. Carter, however, positively identified the Appellant from his photo.

Shortly thereafter, Butterworth saw the Appellant during a televised news report after the Appellant was arrested. Butterworth contacted the police and informed them that the Appellant was the man who came into Captain D's the night before the murders. Butterworth testified that he was sure of his identification of the Appellant after he had the opportunity to hear the Appellant's voice, see the way his lips moved when he talked, and see the way the Appellant walked during the news report.

Jerry Marlin drove by the Captain D's restaurant at approximately 8:45 a.m. on the morning of the murders. Marlin observed a blue Ford station wagon "parked at a funny angle toward the rear of the building." Marlin testified that the car had some damage to its front left end and possibly its left rear quarter panel. The Appellant's light blue 1988 Ford Escort station wagon was appraised by an insurance company on February 3, 1997. The car had damage to the left side of its front end. Marlin testified that the Appellant's car as pictured in the photographs of the insurance company was similar to the car he observed in the Captain D's parking lot that morning.

Debbie Hines also drove by the Captain D's at approximately 8:50 a.m. that Sunday morning on her way to church. She observed a man standing inside the doorway of the restaurant, later identified as Steve Hampton, talking to a man standing outside the door. The man outside had pieces of white paper in his hand. Hines described the man as having dark hair and as being five inches taller than the employee. The Appellant is approximately 6'3" and weighs approximately 200 lbs. Hampton was 5'8" and weighed 189 lbs.

Mark Farmer drove by Captain D's at approximately 9:30 a.m. on his way to breakfast that same Sunday morning. He noticed "a car that sort of looked out of place." According to Farmer, the small to medium-sized car was parked about a car-length away from the front of the building in the opposite direction of the drive-thru arrows painted on the lot. Farmer initially remembered that it was a light blue car, but at trial he also stated it may have been painted a "pinkish plum color." Farmer also observed a man walking away from the restaurant toward the car. Farmer testified that the man was walking in a hurried manner and he stopped at the passenger side of the car. Farmer then stated the man "elevated his face and . . . it seemed like our eyes sort of caught one another, and when he saw that I was watching him, he dropped his head, just completely down in a suspicious way." The man then got in the passenger side of the car. Farmer described the man as tall with a muscular build and large neck. The man had dark eyebrows and dark eyes, a full head of hair which was slicked back, and he was wearing a white t-shirt and white tennis shoes. Farmer saw the Appellant on television after the Appellant's arrest in June 1997. Farmer then called the police and identified the Appellant as the man he saw at Captain D's that morning.

Prior to the murders in this case, the Appellant asked Jeffrey Potter, his co-worker at Shoney's, where he could get a gun. The Appellant also told Potter he was dissatisfied with his job at Shoney's and stated he could make more money committing a robbery. Danny Wayne Tackett, another friend and co-worker of the Appellant, testified that the Appellant was scheduled to work February 16, 1997, but did not come in to work. Tackett also testified that, prior to the murders, the Appellant asked Tackett and his wife to purchase a handgun for him. Arrangements were also made with another Shoney's employee for the Appellant to buy a gun. The Appellant was unsuccessful in both of these attempts and apparently secured the services of another individual. Tackett testified that he and the Appellant discussed robbing fast food restaurants. Tackett stated, however, that he assumed the discussion was simply hypothetical and did not believe the Appellant was being serious. Tackett mentioned that the Appellant was experiencing financial difficulties. After the murders at Captain D's, Tackett observed the Appellant with a stack of approximately $100 to $200 in five dollar bills and a new red car. In fact, on February 18, 1997, the Appellant paid $2,000 down in cash on a new Ford automobile. On February 20, 1997, the Appellant paid the remaining $3,127.92 of the purchase price for the car. When the salesman asked where the Appellant obtained this large amount of cash, the Appellant responded: "Well, I've been very good at saving and my dad is going to be helping me."

On February 4, 1997, the Appellant obtained a loan for $200 using his car title as collateral. The loan was paid off in cash on February 21, 1997. On December 19, 1996, the Appellant had $742.61 in his checking account. On January 22, 1997, the Appellant had $134.45 in his account. On February 12, 1997, the Appellant had $139.35 in his account. On February 27, 1997, the Appellant had $803.67 in his account. The bank employee testified that the Appellant maintained fairly consistent checking transactions during this period and that to his knowledge the Appellant did not have any other bank accounts.

Bernie Billingsly and the Appellant belonged to the same fitness center. During either the last week of February 1997 or the first week of March 1997, the Appellant told Billingsly that he had about $3,000 and he asked Billingsly some questions about investing in the stock market.

After the murders in this case, Robert Bolin sold the Appellant two .25 automatic pistols. The Appellant informed Bolin that he "had a .32 revolver and he didn't like the way it shot. He wanted something that had a clip that holded [sic] more shells."

After the Appellant was arrested in June 1997, the police seized four one-gallon jugs full of coins from the Appellant's residence. The coins appeared to be layered according to their denomination. The jugs contained a little over $1,000.

In defense, the Appellant presented the testimony of TBI Agent Samera Zavaro. Zavaro testified that her DNA examination of the cigarette butts discovered at the restaurant did not match the DNA profiles obtained from the Appellant, Sarah Jackson, or Steve Hampton.

### B. Sentencing Phase

In 1984, the Appellant was previously convicted on one count of aggravated robbery in Texas. The parties stipulated that aggravated robbery is a crime that involves the use of violence to the person. In 1978, two felony indictments returned against the Appellant in Texas were dismissed based upon a finding of permanent incompetence and the Appellant was judicially committed to psychiatric care. According to the testimony, under Texas law, after the defense files a motion and evidence is presented, the issue of competency is decided by a jury before trial commences on the charged offenses. A jury found the Appellant incompetent in 1978; however, a separate jury found him to be competent in the 1984 case, resulting in the aggravated robbery conviction.

Deanna Hampton, Steve Hampton's wife, testified on behalf of the State at the sentencing hearing. Steve Hampton was twenty-five years old when he died and had three young children. Mrs. Hampton testified that Steve Hampton was a good father. She further testified that after her husband's murder she withdrew from everybody, including her children. Both she and her children have received counseling as a result. Paula Sue Guidry, Steve Hampton's mother, also offered victim impact evidence. Hampton was an only child. Ms. Guidry explained to the jury how the loss affected her psychologically and testified that she will not be able to get over his death.

Sarah Jackson's parents both testified at the sentencing hearing. They have suffered psychologically as a result of the murder and have received counseling. Both feel guilty about having allowed their daughter to take a job when she was sixteen. They told the jury nothing can change what has happened and that nothing can replace their daughter. Wayne Jackson, Sarah Jackson's brother, testified that he had a good relationship with his sister and the murder made him extremely angry. He told the jury he will miss having an adult relationship with his sister. Wayne Jackson testified that the holidays are hard on the family and he stated that his younger brother is in denial about the murder.

The Appellant solicited testimony from Gloria Shettles, a private investigator who prepared the Appellant's social history which was provided to the mental health experts in this case. Her account of the Appellant's background came from interviews with the Appellant's family members. The Appellant was born in November 1957. His father died in May 1997. The Appellant's mother has fifteen brothers and sisters. The Appellant has two older sisters. The Appellant's parents divorced when he was about three years old. The Appellant and one of his sisters resided with their father and grandmother. Apparently their father was frequently away from home so the grandmother served as primary caretaker. The Appellant's mother remarried and had two more daughters. The Appellant apparently became unruly as a child and, at age eight, he was sent to a "boys' home" for about two years. There were reports that the Appellant stole mail from his neighbors' mailboxes, took clothes off the neighbors' clotheslines, set his grandmother's bed on fire and beat their dog to death with a baseball bat. According to Shettles, the Appellant's father wanted to put the Appellant up for adoption. The Appellant's mother retrieved the Appellant from the "boys' home" and allowed him to live with her. The Appellant's mother divorced her second husband when the Appellant was about thirteen years old. Shettles testified that this man was sexually abusing the Appellant's older sister. The Appellant left home when he was sixteen years old.

Shettles discovered that the Appellant was arrested for auto theft in 1975, for which he was placed on probation. He was also charged with passing forged checks. The Appellant was married but divorced in 1984. According to Shettles, one of the Appellant's sisters warned the Appellant's ex-wife not to marry him. The Appellant lived with another woman in 1994. This woman told Shettles that the Appellant had a temper; he threw her cat across the room and held a pillow over her face on the couch. Furthermore, Shettles testified that one of the Appellant's sisters feared the Appellant because he had previously threatened to kill her.

Janet Kirkpatrick, the Appellant's sister, testified on his behalf at sentencing. She stated that their father drank and was frequently out of town on business, thus, he relied on the grandmother to take care of the children. The Appellant started school at age seven. According to Kirkpatrick, their grandmother financially supported the family. Kirkpatrick further testified that their grandmother experienced severe discipline problems with the Appellant. The Appellant would throw things at his grandmother. When the Appellant left the "boys' home" and moved in with his mother, his mother changed his name to Leon Morez, the surname of her second husband, because the name "Paul Reid" reminded her of her ex-husband, the Appellant's father. The Appellant suffered a skull fracture as a result of a minibike accident in 1971. The Appellant also hit his head against the windshield of a car and also slipped at work and hit his head on the ground. The Appellant occasionally used drugs. Kirkpatrick testified that her brother became paranoid after he was imprisoned in Texas. Kirkpatrick also testified that the Appellant tried to sexually molest her, her sisters and their mother.

Patsy Casey Allen, a speech and language pathologist, reviewed the Appellant's medical and school records during her evaluation of the Appellant. Allen observed a language disorder in the Appellant which she associated with the head injury he suffered when he was young. Allen also noted that the Appellant suffered from a hearing loss. Furthermore, having reviewed the records,

Allen believed that the Appellant had learning disabilities during his school years. Allen concluded that the Appellant does not have a good vocabulary or knowledge of language rules. Allen opined that the Appellant's speech and language problems were characteristic of people with traumatic brain injuries rather than people with developmental delay. The earliest record reviewed by Allen reflects a traumatic head injury at the age of five.[2] The most severe injury was the skull fracture in 1971, which stemmed from a minibike accident. Allen also testified that the Appellant's lack of consistent schooling and his hearing loss are contributive to his problems.

Dr. Pamela Mary Auble, a clinical neuropsychologist, testified on the Appellant's behalf. Based upon her evaluation of the Appellant, Dr. Auble opined that the Appellant suffers from brain damage in the left temporal lobe which impairs his behavior in a pervasive manner. She also opined that the Appellant has a secondary psychotic disorder, a cognitive disorder and personality changes from his brain injuries. Dr. Auble indicated that the Appellant meets some of the criteria for antisocial personality disorder as well. Her evaluation entailed more than eight hours of interviews over the course of a year and the administration of eighteen standardized tests. She also reviewed the Appellant's medical and school records and interviewed the Appellant's mother and two sisters. Apparently, the Appellant also has a history of mental illness on his mother's side of the family.

Dr. Auble testified that the damage to the left temporal lobe manifests itself by causing the person to have delusions and other disorders associated with their thinking. Also, a person with this type of damage has a compulsion to talk and write excessively. Dr. Auble noticed these traits in the Appellant. Dr. Auble stated, as did Allen, that the Appellant uses words that are not real words and that he uses words inappropriately. Dr. Auble believed that the Appellant has shown abnormalities in his functioning since childhood and that those abnormalities were worsened by the head injuries he suffered. Also, Dr. Auble found it significant that the Appellant was born with a malformation of his left ear. In making her diagnosis of the Appellant, she also reviewed and considered the evaluations performed on the Appellant after he started school, finding that the Appellant exhibited functioning problems, had trouble learning and relating to other children, and had behavior problems. Dr. Auble testified that people with brain damage need a more structured and stable environment than others, and that the Appellant did not have this growing up.

Dr. Auble testified that his Texas prison records reflect that the Appellant responded well to medication for treatment of his psychosis. She related to the jury letters the Appellant wrote to the Governor of Texas and the editor of the Washington Post explaining how he was being monitored by the government. Also, the Appellant's sisters and ex-girlfriend informed Dr. Auble that the Appellant told them he was being monitored by the government. According to Dr. Auble, these instances, as well as the statements the Appellant made to the police in this case and the statements he made to Dr. Auble during the interviews about being monitored by the government, support the conclusion that the Appellant is delusional.

---

[2]This injury allegedly resulted from the Appellant's mother striking him on the head with a brick.

Dr. Auble testified that the Appellant was very polite and eager to please and perform well during their interviews. Based on standardized testing, Dr. Auble concluded that the Appellant has a below average I.Q.; in the nineteenth percentile. This score was consistent with scores from the Appellant's childhood. Dr. Auble opined that the Appellant was defensive about his shortcomings, attempted to avoid his feelings, and acted insecure. However, Dr. Auble admitted that neither the Minnesota Multiphasic Personality Inventory (MMPI) nor Rorschach personality test revealed evidence of psychosis in this case. Dr. Auble also stated that the Appellant does have a history of some malingering.

The Appellant also solicited testimony from Dr. Robert M. Kessler, a neuroradiologist. Dr. Kessler performs imaging of the brain to diagnose the presence of disease. Dr. Kessler performed Magnetic Resonance Imaging (MRI) and Positron Emission Tomography (PET) scans on the Appellant. Dr. Kessler opined that the Appellant suffered shrinkage and acquired damage to the left temporal lobe of the brain which was likely caused by an injury to his head after age six or seven. Dr. Kessler further opined that the Appellant exhibits mild to moderately severe functional abnormality in the left temporal lobe of his brain. According to Dr. Kessler, this portion of the brain is responsible for visual and auditory processing, as well as emotional processing and memory. Dr. Kessler testified that the Appellant lost brain material after his brain had achieved normal development.

Dr. Xavier F. Amador, a clinical psychologist, also evaluated the Appellant and testified as to his findings. Dr. Amador was approached by the Appellant's pastor and eventually volunteered to evaluate the Appellant. Dr. Amador concluded that the Appellant suffers from paranoid schizophrenia, continuous type, as well as cognitive disorder. Dr. Amador opined that the Appellant has personality change, combined type, which is caused by the Appellant's head injuries. Dr. Amador conducted a total of twenty hours of interviews with the Appellant, interviewed the Appellant's mother and sister, and reviewed all of the records provided to him by the defense.

Dr. Amador testified that the Appellant maintains longstanding delusions about government surveillance and that there is evidence in the Appellant's medical records that he has at times been evaluated and treated for some type of brain dysfunction or psychotic disorder. The Appellant's medical records reflect that he has been prescribed at least eight different antipsychotic drugs over his lifetime which improved his behavior in most cases. When he was nine and one-half years old, a committee in the Appellant's school district recommended that he be enrolled in special education classes for children with brain damage. Dr. Amador testified that schizophrenia usually develops in men in their late teens to early twenties and this coincides in time with the Appellant's records that reflect when he started having these delusions about government surveillance. Like Allen and Dr. Auble, Dr. Amador also noticed problems regarding the Appellant's speech pattern. And like Dr. Auble, Dr. Amador testified that the Appellant attempted to perform well and act as normal as possible during their meetings.

Dr. Amador testified that the records reflect that after the Appellant suffered the minibike injury at age thirteen, he encountered more behavior problems and his performance in school

dropped. Dr. Amador opined that the Appellant's mental illness and inability, due to his brain damage, to control his anger and emotions and impulses, combined with the lack of socialization and guidance received as a child, renders the Appellant "very ill-equipped to deal with reality." When asked about the results of the tests administered by Dr. Auble, Dr. Amador testified that the MMPI and Rorschach tests are adjunct tools and are not the primary diagnostic tools used in clinical practice. Dr. Amador testified that during the commission of the crimes, the Appellant was under the influence of his delusions.

Joe Ingle, an ordained minister in the United Church of Christ, started visiting the Appellant in prison shortly after the Appellant's arrest in June of 1997. Reverend Ingle primarily participates in prison ministries. After counseling the Appellant and learning about his history, Reverend Ingle contacted the Appellant's sister and mother and discovered that the Appellant's version of his upbringing was not consistent with reports Reverend Ingle received from the Appellant's family. As a result, Reverend Ingle contacted Dr. Amador for his expert assistance in understanding the Appellant's thought processes.

The State introduced several witnesses in rebuttal. Raymond Lackey, Jr. is the attorney who represented the insured of the insurance company the Appellant sued in April 1997 over an automobile accident involving his blue Ford Escort. The Appellant represented himself at trial and, according to Lackey, the Appellant performed as well as anyone he had seen represent themselves. Lackey testified that the Appellant acted friendly and respectful before and during the proceeding. Lackey, however, only had contact with the Appellant briefly before and during the relatively short trial. The Appellant's claim was unsuccessful.

Janice Roar, Director of Admissions at Volunteer State Community College, testified that the Appellant registered to attend the school in January of 1997. The Appellant enrolled in three remedial and developmental courses, which are considered college preparatory classes. According to the school's records, the Appellant was deficient in English, math, foreign language, and visual and performing arts. The Appellant scored an A in all three classes.

The State recalled Brian Johnson, who testified earlier in the sentencing phase regarding the Appellant's prior conviction in Texas. Johnson served as the prosecutor in that trial. Johnson testified that during the competency hearing the Appellant fell over backwards in his chair, shot pieces of paper in the air with a rubber band, and made a paper hat and placed it on his attorney's head. All of this was in the presence of the jury. After he was convicted and placed in prison, the Appellant wrote Johnson a letter stating that he was not crazy and that he apologized for his behavior in the courtroom. The Appellant told Johnson that he felt threatened in prison and asked Johnson if he could assist him in getting his sentence reduced.

Dr. Helen Mayberg, a professor of psychiatry and neurology at the University of Toronto, focuses on studying behavior using brain imaging. The State solicited Dr. Mayberg to review the MRI and PET scans utilized by Dr. Kessler in his evaluation. Dr. Mayberg, in her evaluation, also reviewed the Appellant's records. Dr. Mayberg concurred with Dr. Kessler's finding that the

Appellant's left temporal lobe displayed some abnormality. However, given the fact that the Appellant was born with a malformed left ear, and after reviewing the scans, Dr. Mayberg was of the opinion that the abnormalities to the temporal lobe were not associated with trauma. According to Dr. Mayberg, the condition of the Appellant's brain was congenital rather than acquired. Dr. Mayberg agreed with Dr. Kessler that there is decreased metabolism in the left temporal lobe; however, she did not notice any abnormalities in the other areas of the brain connected to this portion of the temporal lobe. Given the literature in her field of expertise, Dr. Mayberg did not believe schizophrenia could be associated with this type of abnormality. She also testified that this type of brain condition has not been associated with the act of premeditated murder. In other words, Dr. Mayberg stated that there was nothing impulsive about these crimes to suggest they related to this condition of the brain. Dr. Mayberg testified on cross-examination, however, that although it would be speculative, it is possible there is a cause and effect between the Appellant's brain condition and his behavior. Dr. Mayberg did not meet with or interview the Appellant. Accordingly, she testified that she could not offer a diagnosis about whether the Appellant is schizophrenic or not.

Dr. Dan Martell, a forensic neuropsychologist, also testified for the State. Dr. Martell is employed by a private forensic consultation firm. Dr. Martell studies the relationship between brain disorders and violent behavior. Dr. Martell interviewed the Appellant over two days for about twelve hours and also reviewed all of the Appellant's records and reports from the other experts in this case. Dr. Martell was asked by the State to determine whether the Appellant was suffering from an extreme mental or emotional disturbance at the time he committed the murders and whether the Appellant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of the mental disease or defect. Dr. Martell concluded that the Appellant suffers from a mild neurocognitive disorder, antisocial personality disorder, and a delusional disorder. Dr. Martell opined that the Appellant's mental status did not affect his ability to conform or appreciate his conduct at the time of the crimes. The Appellant's cognitive disorder impairs his speech pattern; but Dr. Martell testified that this disorder would not affect his ability to plan the crimes in this case. Antisocial personality is characterized by the failure to conform to social norms, deceitfulness, irritability and aggressiveness, and lack of remorse. Dr. Martell testified that the Appellant exhibits all of these traits. Moreover, Dr. Martell testified that this condition is not related to his brain disorder.

Dr. Martell testified that there were some reports where the Appellant tested low on his I.Q. exams. According to Dr. Martell, the Appellant told him he was attempting to perform poorly on these tests. Dr. Martell also noticed two medical reports which indicated the Appellant was malingering. However, Dr. Martell testified on cross-examination that he believed the Appellant does suffer from a delusional disorder. According to Dr. Martell, persons suffering from delusional disorders experience peaks and valleys, in that there are times when the disorder is in remission. During their interview, the Appellant was hesitant to talk about the government surveillance because he did not want this information made known to the jury. Dr. Martell testified that, if the Appellant was in a delusional state, he would probably not have committed the crimes because of his fear of being noticed by the government surveillance. Dr. Martell suggested that the disorder may have been in remission at the time. Other than the delusional disorder, which can affect one's behavior, Dr.

Martell found no other evidence that the Appellant is suffering from a psychosis. Dr. Martell testified that the other experts who diagnosed the Appellant as having schizophrenia were incorrect in their diagnoses. Given the facts presented in this case, Dr. Martell opined that the Appellant's capacity to plan, execute, and cover-up these crimes was not impaired. To the contrary, according to Dr. Martell, these facts demonstrate the Appellant was able to effectively use his cognitive abilities.

## I. Motion to Suppress

### A. Admissibility of Identification Testimony

The Appellant argues that the trial court erred by denying his motion to suppress the identification testimony of witnesses Michael Butterworth and Mark Farmer. Specifically, he argues that the procedures that led to the identifications were unduly suggestive and violative of his due process rights. Following an evidentiary hearing and argument of counsel, the trial court denied the Appellant's motion and admitted the testimony of both Butterworth and Farmer.

The standard by which an appellate court reviews a trial court's findings of fact on suppression issues is as follows:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000); State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). The application of the law to the facts found by the trial court, however, is a question of law, which this court reviews *de novo*. State v. England, 19 S.W.3d 762, 766 (Tenn. 2000); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997).

### 1. Testimony of Michael Butterworth

On February 15, 1997, the night before the murders, the Appellant entered the Captain D's restaurant on Lebanon Road and requested a job application from employee, Michael Butterworth. According to Butterworth, he spoke with the Appellant a few minutes before the Appellant left the restaurant. Approximately four months later, in June of 1997, Butterworth was shown a photographic lineup which contained a photo of the Appellant and five other persons. Butterworth, while not excluding any of the photographs, was unable to identify any of the photos as the person he had seen at Captain D's the night before the murders. The next day, Butterworth was watching the news when he saw coverage of the Appellant's arrest on television. He immediately recognized

the Appellant and phoned police to tell them that the Appellant was the person he spoke with at Captain D's the night before the murders. The police never instructed Butterworth to watch the newscast.

### 2. Testimony of Mark Farmer

On the morning the murders were committed, at approximately 9:30 a.m., Mark Farmer was driving by Captain D's and noticed a car parked in an unusual manner outside the restaurant. As he glanced at the restaurant, he noticed a man exiting the building. As they made eye contact, the man looked down quickly in a suspicious manner. After hearing about the crime, Farmer phoned police on three separate occasions to report seeing a man at the restaurant on the morning of the murders. Police, however, never responded or contacted Farmer about what he saw. In June of 1997, Farmer was watching the news when he saw coverage of the Appellant's arrest on television. He instantly recognized the Appellant as the person he saw leaving the restaurant on the morning of the murders and phoned police.

### 3. Analysis

In support of his arguments, the Appellant cites to Neil v Biggers, 409 U.S. 188, 93 S. Ct. 375 (1972), wherein the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification, namely: (1) the court must determine whether the procedure used to obtain the identification was unduly suggestive and (2) if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable.[3] The Appellant argues that this court must apply the above test in order to determine if the testimony should have been admitted. Specifically, he asserts the procedure by which the witnesses identified him were "unduly suggestive." In addition to his argument that the television identification itself was unduly suggestive, the Appellant contends that Butterworth only "instantly recogniz[ed]" him on television because he had seen his picture in the photo array the previous day.

The Appellant's reliance on Biggers is misplaced. While Tennessee law has long recognized that any identification procedure initiated or designed by police which is inherently suggestive violates the accused's due process rights, see State v. Thomas, 780 S.W.2d 379 (Tenn. Crim. App. 1989); State v. Beal, 615 S.W.2d 77 (Tenn. Crim. App. 1981); Sloan v. State, 584 S.W.2d 461 (Tenn. Crim. App. 1978), it has also long been recognized that a defendant's constitutional rights cannot be violated where the State is not involved in the alleged suggestive activity. A private party acting for a reason independent of a governmental purpose does not implicate the Fourth Amendment. State v. Burroughs, 926 S.W.2d 243, 246 (Tenn. 1996).

In Bishop v. State, 582 S.W.2d 86, 91 (Tenn. Crim. App. 1979), this court held that no state action was involved where a witness, who had seen the defendant at her neighbor's home prior to the murder, first identified the defendant by use of a single picture in a local newspaper and subsequently reported the identification to police. Similarly, in State v. Mosby, 639 S.W.2d 672,

---

[3]The Tennessee Supreme Court adopted the Biggers test in Bennett v. State, 530 S.W.2d 511, 514 (Tenn. 1975).

-14-

673 (Tenn. Crim. App. 1982), the victims' neighbor heard one of the victims describing the assailant, went home, and returned with a photograph. Police had yet to arrive at the scene. Upon viewing the photograph, both victims identified the person in the picture as their assailant. On appeal, the defendant argued that the identification should be suppressed because the neighbor's actions of showing the photograph to the victims were "impermissibly suggestive." This court disagreed and held that because there was no evidence suggesting that the neighbor was connected to law enforcement, "there was no state involvement in his showing the single photograph to [the victims]." Id. As such, the court held that the identification testimony was properly admitted. See also State v. Dixon, 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983)(absent evidence that police arranged to stage a confrontation between the defendant and the victim, identification resulting from the observation was not induced by an inherently suggestive show up).

In the present case, both Butterworth and Farmer were exposed to the Appellant through spontaneous or inadvertent viewing on television. Butterworth testified that once he saw the Appellant "walk, talk and his lips move," he was absolutely sure that the Appellant was the person he had spoken with at the restaurant the night before the murders. There was absolutely no evidence introduced at the hearing which suggested that either witness was told by law enforcement officers to view the broadcast. In fact, both witnesses testified that no one told them to watch the news. As the trial court correctly noted, "such accidental or inadvertent showings do not raise a constitutional issue." Thus, these issues are without merit.

Additionally, the Appellant argues that law enforcement should have used a physical lineup rather than a photographic lineup, arguing that a physical lineup is more reliable. He contends that the use of a photographic lineup, when a physical lineup was possible, was unduly suggestive. At the suppression hearing, Detective Postiglione, the officer who conducted the photographic lineup, testified that he, too, would have preferred a physical lineup. However, Detective Postiglione testified that a physical lineup was not feasible at the time because the Cheatham County Jail, where the Appellant was being housed, did not contain a sufficient number of prisoners to conduct a physical lineup. Instead, Detective Postiglione traveled to Cheatham County to get a photograph of the Appellant and returned to Nashville to conduct the photographic lineup. Detective Postiglione stated that anything other than a photographic lineup would have taken "several hours," which was an unreasonable amount of time under the circumstances.

After examining the photographic lineup which was introduced into evidence, we note that the exhibit contained photographs of six white males of approximately the same age. The Appellant's photograph was not distinctive from the others in any manner. Eyewitness identification at trial, following a pretrial identification by photograph, will not be set aside on that ground unless the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968). We find, under these circumstances, that the photographic identification was not impermissibly suggestive. The Appellant has failed to make the required showing that the identification was unreliable. See State v. Sanders, 842 S.W.2d 257, 259 (Tenn. Crim. App. 1992). Thus, the procedure was proper and this issue is also without merit.

Lastly, the Appellant argues that the identification testimony was suggestive because law enforcement officers failed to shield him from television and media coverage when transporting him to court for arraignment. First, we note that the Appellant cites no authority for the proposition that the officers had the duty to shield his face from media coverage during his transportation and subsequent court appearance. As such, this issue is waived. See State v. Dickerson, 885 S.W.2d 90, 93 (Tenn. Crim. App. 1993); Tenn. R. App. P. 27(a)(7). Notwithstanding, we find this issue to be without merit. At the suppression hearing, Detective Postiglione testified that prior to transporting the Appellant, he explained that the Appellant could cover his head with a jacket during transportation and later, in court, could face the wall so that television cameras and observers would not be able to see his face. Initially, the Appellant agreed. Just before exiting the jail, however, the Appellant changed his mind and stated, "This is going to be the Paul Reid trial." He did not cover his head during transportation and, at court, turned completely around and faced everyone in the room during the entire course of proceedings. The Appellant was given the option to conceal his identity and declined the opportunity. He cannot now complain that the identification testimony of Butterworth and Farmer was suggestive based upon his failure to mask his identity in front of news cameras. See generally Tenn. R. App. P. 36(a).

### B. Admissibility of Items Seized from the Appellant's Residence

The Appellant argues that the trial court erred by denying his motions to suppress items seized from his residence pursuant to search warrants 146 and 149. The Appellant raises three issues which are common to both search warrants 146 and 149: (1) that his federal and constitutional rights were violated because the items seized were not particularly described in the warrant; (2) that the affidavits to each warrant do not state probable cause because there is no nexus between the criminal activity and the place searched; and (3) that the Appellant was not personally delivered a copy of the warrants served in violation of Tenn. R. Crim. P. 41(c). Additionally, the Appellant contends that warrant 149 was invalid because the attachment, entitled "Affidavit of Probable Cause," was not expressly incorporated by reference into the warrant.

Again, we note that a trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. Daniel, 12 S.W.3d at 423; Odom, 928 S.W.2d at 23. Nonetheless, this court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts as determined by the trial court is a question of law which is reviewed *de novo* on appeal. Yeargan, 958 S.W.2d at 629. Furthermore, the Appellant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. See Odom, 928 S.W.2d at 22-23.

### 1. Particularity of Items Described in Warrant

First, the Appellant argues that the items seized from his residence pursuant to warrants 146 and 149 should have been excluded from evidence because they were not particularly identified in the warrants. Specifically, the Appellant contends that none of the items seized belonged to either the restaurants or the victims and that none of the items seized could have caused the deaths of the victims.

Search warrant 146 was issued on June 3, 1997, and authorized the following search of the Appellant's residence:

Items which may be identified as property belonging to Captain D's restaurant or McDonald's Corp.[4] Items belonging to the victim's of each restaurant/crime scene located at 2633 Lebanon Road and 3470 Lebanon Road. Any items which may be used to cause the death of the victims of each establishment. These crimes were committed on 2/16/97 and 3/23/97.

Warrant 149, which was issued on June 5, 1997, used the same language as warrant 146, but additionally included, "any and all financial records to include those indicating monies paid out by [the Appellant] on an automobile lease during the time period that any of the restaurant murders occurred."[5] An affidavit was attached to each warrant setting forth the nature and circumstances of the respective crimes. The affidavits noted that several items had been taken from the restaurants, including bank bags. With respect to warrant 146, officers seized four jars full of coins, six pairs of shoes, one duffle bag, one brown carry bag, assorted photos, one Bible, three knives, and three hats. With respect to warrant 149, officers seized a box of photo albums, a bag containing photos and negatives, a bag of assorted letters and mail, women's toiletry items, keys, teeth molds, and assorted magazines, papers, and notes.

Our federal constitution provides that no warrants shall issue except those "particularly describing the place to be searched." U.S. Const., amend. IV. A warrant meets this requirement if it describes the place to be searched with such particularity that the searching officer can, with reasonable effort, ascertain and identify the intended place. See Steele v. United States, 267 U .S. 498, 502, 45 S. Ct. 414 (1925); see also United States v. Gahagan, 865 F.2d 1490, 1496 (6th Cir. 1989). Likewise, Tennessee law prohibits general warrants, see Tenn. Const., art. I, § 7, and provides that a search warrant must be supported by an affidavit "particularly describing the property, and the place to be searched." Tenn. Code Ann. § 40-6-103 (1997). This requirement is satisfied if the description "particularly points to a definitely ascertainable place so as to exclude all others, and enables the officer to locate the place to be searched with reasonable certainty without leaving it to his discretion." State v. Smith, 868 S.W.2d 561, 572 (Tenn.1993), cert. denied, 513 U.S. 960, 115 S. Ct. 417 (1994). The description of the place to be searched is adequate if it designated the property accurately enough that the officer conducting the search of the premises of one person under a warrant would be prevented from searching instead the premises of another person. See State v. Cannon, 634 S.W.2d 648, 650 (Tenn. Crim. App.1982) (citing Lea v. State, 181 S.W.2d 351 (Tenn. 1944)). Additionally, Tenn. R. Crim. P. 41(b) provides:

_____

[4]At the time of this investigation, the Appellant was also under investigation for the murders, robbery and assault of employees of a Nashville McDonald's restaurant.

[5]Law enforcement officers executed five other search warrants in addition to the two at issue above. All seven warrants were challenged by the defense in pretrial motions. The State, however, gave notice prior to trial that it did not intend to introduce the evidence seized pursuant to the other five warrants and did not seek admission of this evidence at trial. Thus, on appeal, the Appellant only challenges evidence introduced from warrants 146 and 149.

(b) Property Which May Be Seized with a Warrant. — A warrant may be issued under this rule to search for and seize any:

> (1) Property that constitutes evidence of the commission of a criminal offense; or
> (2) Contraband, the fruits of crime, or things otherwise criminally possessed;
> (3) Property designed or intended for use or which is or has been used as the means of committing a criminal offense; or
> (4) Person for whose arrest there is probable cause or who is unlawfully restrained.

In State v. Meeks, 867 S.W.2d 361, 372 (Tenn. Crim. App. 1993), this court recited the language found in Lea v. State, 181 Tenn. at 378, S.W.2d at 352-53, wherein our supreme court distinguished between the character and the identity of the targeted item during a search as follows:

> Thus, where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose [is] to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be necessary, and ordinarily impossible.

Here, as in Lea, the type of evidence that the officers were looking for was of a specific character, rather than a specific property. The officers were looking for items that might have been taken from either the victims or the restaurants. It would have been impossible to provide a particular description of everything which might have been taken from the restaurants or victims. Thus, we find the warrants sufficiently set forth the character of the items which were the subject of the search.

Finally, if during the lawful search the officers find items that are not specified in the warrant, but which are immediately apparent to be contraband, fruit of the crime, or evidence of criminal conduct, their right to seize these items is governed by the plain view exception to the warrant requirement. Meeks, 867 S.W.2d at 373; see also Horton v. California, 496 U.S. 128, 136-141, 110 S. Ct. 2301, 2308-2310 (1990). The plain view doctrine is applicable where the items seized are in plain view, and the viewer has a right to be in the position to see the items. Horton, 496 U.S. at 137, 110 S. Ct. at 2308; State v. Hoerner, 605 S.W.2d 835, 836 (Tenn. Crim. App. 1990).

In the present case, Detectives Postiglione and Roland testified about their reasons for seizing the items found in the Appellant's apartment. With respect to warrant 146, Detective Postiglione testified that he seized the four jars of coins because of the large quantity involved and because change had been taken in both robberies. Six pairs of shoes were seized for comparison to shoe prints found at the two restaurants. Knives were seized because one victim had been stabbed and three hats were taken because the suspect was portrayed wearing a hat in two of the composite

drawings. Finally, Detective Postiglione testified that he took large numbers of photographs because some of the photos were pictures of various intersections in Nashville and he felt the photos might be tied to other robberies. With respect to warrant 149, Detective Roland testified that he seized numerous photos, some of which also contained pictures of various Nashville intersections. Detective Roland testified that all photos were seized because it would have been impossible to sort through all of the photos to determine if they were incriminating at the time of the search. The women's toiletry items were seized because he felt the items might belong to one of the female victims. The keys were seized because the keys to Captain D's had been missing since the crime. Finally, the magazines, notes, and assorted papers were taken in an effort to uncover the financial records described in warrant 149. As the trial court correctly found, "the items sought were described with particularity and items recovered were in plain view." Thus, this issue is without merit.

### 2. Nexus Between Residence and Crime
The Appellant next argues that the items seized should have been suppressed because "there is no connection stated in the warrants or supporting affidavits between the criminal activity and the . . . defendant's residence." Specifically, the Appellant contends that "the crimes had been committed several months prior to the issuance of the warrants so that the information provided in the affidavits is too stale to establish the nexus." The Appellant further asserts that the affidavits provided no information which would give officers probable cause to believe that evidence concerning the crimes would be located at the Appellant's residence.

In State v. Longstreet, 619 S.W.2d 97, 99 (Tenn.1981), our supreme court held that to establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place to be searched pursuant to the warrant. State v. Vann, 976 S.W.2d 93, 105 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467 (1999). Accordingly, the nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence. Smith, 868 S.W.2d at 572; see United States v. Jacobs, 715 F.2d 1343, 1346 (9th Cir. 1983). The affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. Vann, 976 S.W.2d at 105. Although the lapse of time between the occurrence of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause must be determined on a case by case basis. State v. Meeks, 876 S.W.2d 121, 125 (Tenn. Crim. App. 1993); see also Sgro v. United States, 287 U.S. 206, 210-11, 53 S. Ct. 138, 140 (1932). In making this decision, the issuing magistrate should consider (1) whether the criminal activity under investigation was an isolated event or of a protracted and continuous nature, (2) the nature of the property sought, and (3) the opportunity those involved would have had to dispose of incriminating evidence. Meeks, 876 S.W.2d at 125; see United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975).

In the present case, the warrants issued sought to include any items that may have been used to cause the death of the victims. The warrants also sought to recover any property that may have

been taken from the victims or the restaurant. The attached affidavits set forth the facts surrounding both the Captain D's and McDonald's robberies, including the fact that all of the victims had been killed with the exception of one who had been stabbed numerous times. Furthermore, the affidavits noted that the Appellant's fingerprint had been recovered from an item found belonging to one of the Captain D's victims. As stated above, probable cause is determined on a case by case basis. Meeks, 876 S.W.2d at 125. It is neither unreasonable nor unlikely that a perpetrator, who believes his identity to be unknown, would keep items he or she has taken or the instruments used to commit the crime at his or her residence. See Smith, 868 S.W.2d at 572. In this instance, it is apparent from the facts that the Appellant eluded capture for some time and intended to leave no witnesses to his crimes. Therefore, it is likely the Appellant would have concluded that his identity was unknown to police, dispelling the necessity of disposing of any incriminating items. Although a few months passed between the crimes and the search, we find a sufficient nexus between the items sought and the Appellant's residence. This issue is without merit.

### 3. Tenn. R. Crim. P. 41(c)

The Appellant argues that a violation of Tenn. R. Crim. P. 41(c) occurred when law enforcement officers failed to personally deliver to him a copy of search warrants 146 and 149 when each was executed. At the time the warrants were issued, the Appellant was incarcerated at the Cheatham County Jail.[6] Tenn. R. Crim. P. 41(c) reads in pertinent part as follows:

> [T]he failure of the serving officer *where possible to leave* a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

(Emphasis added). At the suppression hearing, Detective Postiglione and Detective Roland both acknowledged that they were aware of the Appellant's incarceration and knew where he could be found when both search warrants were issued. In both cases, however, the detectives testified that they left a copy of the search warrant locked inside the Appellant's residence. There was no one present on whom the officers could serve the warrant or with whom they could leave a copy as required by Tenn. R. Crim. P. 41(c). The Rule requires the officers to *leave* a copy with the person, not personally deliver a copy to the person if he or she is not present. Thus, we do not read the provisions of Rule 41(c), concerning the leaving of a copy of the warrant with the person served, to prevent a search when no person is present or in occupancy of the premises to be searched. See generally Poole v. State, 467 S.W.2d 826, 832 (Tenn. Crim. App. 1971). This issue is without merit.

### 4. Failure to Incorporate Affidavit by Reference in Warrant

Lastly, the Appellant argues that search warrant 149 is invalid because the language of the warrant does not incorporate by reference the affidavit of probable cause that appears on a separate

---

[6] As previously noted, the Appellant's incarceration in the Cheatham County Jail stemmed from another incident where he attempted to kidnap the manager of a Shoney's restaurant.

page. An affidavit is an indispensable prerequisite to the issuance of a search warrant. State v. Lowe, 949 S.W.2d 300, 303 (Tenn. Crim. App. 1996). Despite this fact, however, in Tennessee, an affidavit is not considered an actual part of the warrant. Id. Tennessee Code Annotated section 40-6-103 provides that "[a] search warrant can only be issued on a probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." See also Tenn. R. Crim. P. 41(c). Neither the statute nor the rule requires that the affidavit, which is used to establish probable cause, must be incorporated by reference. Rather, case law holds that an affidavit must be incorporated by reference where the search warrant inadequately describes the location to be searched. See Lowe, 949 S.W.2d at 303; see also Hackerman v. State, 223 S.W.2d 194, 196 (Tenn. 1949); State v. Smith, 836 S.W.2d 137, 141(Tenn. Crim. App. 1992). In the present case, the search warrant adequately described the location of the place to be searched. Further, the affidavit was properly attached to the warrant and presented to the magistrate for a determination of probable cause. No additional requirements are provided by law. Thus, this issue is without merit.

## II. Voir Dire of the Venire

### A. *Use of Religious Tests*

Prior to trial, the Appellant filed a motion requesting that the court prohibit the use of "religious tests" during jury selection. He argued that the removal for cause of prospective jurors who oppose the imposition of the death penalty because of "sincerely held" religious, moral or philosophical beliefs violates Article I, section 6 of the Tennessee Constitution. He further asserted that the question, "whether the juror's 'sincerely held' religious, moral, or philosophical beliefs would preclude them from following their oath as jurors," violates Article I, sections 3, 4, 6, 8, and 17 and Article XI, section 8 of the Tennessee Constitution. Indeed, the Appellant argued that the only inquiry which is constitutionally permissible when a prospective juror expresses an opposition to the death penalty upon religious, moral or philosophical grounds is that of determining whether the belief is sincerely held. The trial court denied the Appellant's motion. The Appellant now contends that this denial was error.

A person otherwise competent may not be disqualified as a juror because of his or her religious beliefs. In other words, no religious test shall be put forth to the person. Religious tests probe religious beliefs. See Wolf v. Sundquist, 955 S.W.2d 626, 631 (Tenn. App.), perm. to appeal denied, (Tenn. 1997) (citing Torcaso v. Watkins, 367 U.S. 488, 494, 81 S. Ct. 1680, 1683 (1961); Patty v. McDaniel, 547 S.W.2d 897, 908 (Tenn. 1977), rev'd on other grounds, 435 U.S. 618, 98 S. Ct. 1322 (1978)). For example, a person may not be excluded from jury service because of their lack of belief in a Supreme Being nor may a judge coerce a prospective juror to take an oath which includes a reference to God where the prospective juror is an atheist. See generally 47 AM. JUR. 2d, *Jury* § 177 (1995). However, the exclusion by a trial court of prospective jurors because of their moral or religious-based reluctance to impose the death penalty is not error. In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath. See generally State v. Jones, 789 S.W.2d 545, 547 (Tenn.), cert. denied, 498 U.S. 908,

111 S. Ct. 280 (1990); State v. Bobo, 727 S.W.2d 945, 949 (Tenn.), cert. denied, 484 U.S. 872, 108 S. Ct. 204 (1987). The Court of Appeals, in Wolf v. Sundquist, reaffirmed this principle, stating:

> It is now settled that a criminal defendant's constitutional rights are not violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath.

Wolf v. Sundquist, 955 S.W.2d at 629 (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985); Adams v. Texas, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526 (1980); State v. Hutchinson, 898 S.W.2d 161, 167 (Tenn. 1994), cert. denied, 516 U.S. 846, 116 S. Ct. 137 (1995); State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 758 (1990)). The court further held that questioning jurors concerning their religious beliefs with regard to the death penalty does not amount to a religious test.[7] Wolf v. Sundquist, 955 S.W.2d at 631. In sum, the court held that the exclusion of jurors who because of their religious beliefs cannot apply the law to the facts of a particular case is not error.[8] Wolf v. Sundquist, 955 S.W.2d at 633. This issue is without merit.

### B. Other Issues Concerning Voir Dire

The Appellant raises additional issues regarding the trial court's direction of voir dire within the jury selection process in his case. Specifically, the Appellant contends that the court improperly limited the Appellant's ability to learn about potential jurors' attitudes toward mental health evidence, improperly questioned jurors concerning opinions about the death penalty, and improperly commented that the court expected the Appellant to be found guilty. The State asserts that the Appellant has waived any challenge related to jury composition based upon his failure to exhaust all peremptory challenges. With regard to challenges to specific jurors,[9] we agree that the Appellant has waived any challenge on appeal. See generally State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339 (1994); State v. Middlebrooks, 840 S.W.2d 317, 329 (Tenn. 1992); State v. Teel, 793 S.W.2d 236, 247 (Tenn.), cert. denied, 498 U.S. 1007, 111 S. Ct. 571 (1990). It is only where a defendant exhausts all of his peremptory challenges and is thereafter forced to accept an incompetent juror can a complaint about the jury selection process have merit. State v. Coury, 697 S.W.2d 373, 379 (Tenn. Crim. App. 1985) (citing Hale v. State, 198

---

[7]Like the State, we are strained to find logic behind the Appellant's assertion that the only appropriate inquiry is whether a religious belief is "sincerely held." Accordingly, we find it unnecessary to address this complaint.

[8]The Appellant recognizes the Court of Appeals' decision in Wolf v. Sundquist as dispositive of this issue. Notwithstanding, he asserts that "Wolf is incorrectly decided." As the State acknowledges, the Appellant fails to offer any argument for his position. We agree with the Court of Appeals' rationale in Wolf. Accordingly, we reject the Appellant's contention that the court's decision is flawed.

[9]The Appellant's brief makes reference to Prospective Juror Gerald Hodges in his challenge to the limitation of questioning into mental health issues. Additionally, within his challenge to the trial court's questioning the jurors regarding their opinion of the death penalty, the Appellant makes specific reference to prospective jurors William Nelson, Gerald Hodges, Gary Hixson, Terry McNabb, Troy Calloway, Willie King, Patricia Anderson, Justin Law and Robert Brown. These challenges are waived for failure to exhaust all peremptory challenges.

Tenn. 461, 281 S.W.2d 51 (1955); McCook v. State, 555 S.W.2d 411, 413 (Tenn. Crim. App. 1977)). Further, the record shows that the jury that heard the case was fair and impartial. There is nothing in the record to show that any prejudice resulted to the Appellant by the manner of the selection process utilized. Accordingly, we find no error. However, because of the manner in which the remaining challenges are phrased, we choose to address the challenges on their merits.

### *1. Limitation of Inquiry into Mental Health Evidence as Mitigating Circumstance*

Tennessee Rule of Criminal Procedure 24(a), in pertinent part, states that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges." It further states that "[t]he court . . . may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors." Although the rule provides no test for determining whether the scope of questioning is adequate to fulfill the rule's purpose, Tennessee courts have held that "the scope and extent of voir dire is entrusted to the discretion of the trial judge, and his actions will not be disturbed unless clear abuse of discretion is shown." State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993); see also State v. Smith, 993 S.W.2d 6, 28 (Tenn.), cert. denied, 528 U.S. 1023, 120 S. Ct. 536 (1999). Thus, the method of voir dire, *i.e.,* individual or group,[10] the questions that may be asked, and the scope of inquiry are all within the discretion of the trial court.[11]

In the present case, the trial court, prior to the commencement of jury selection, instructed counsel that individual voir dire would be limited to issues surrounding pretrial publicity and death qualification, "unless there has been something on that questionnaire that we need to deal with individually." Defense counsel informed the court that, from the questionnaires,

> an amazingly large number of jurors recorded for us mental health issues related to themselves or to their family. As this obviously would be a subject of voir dire where they have indicated something which is innately a personal topic, I wonder if the Court would like to consider those questions. [[12]]

---

[10] Howell, 868 S.W.2d at 247; State v. Van Tran, 864 S.W.2d 465, 473-474 (Tenn. 1993), cert. denied, 511 U.S. 1046, 114 S. Ct. 1577 (1994).

[11] State v. Smith, 857 S.W.2d 1, 19-20 (Tenn. 1993), cert. denied, 510 U.S. 996, 114 S. Ct. 561 (1993); State v. Irick, 762 S.W.2d 121, 125 (Tenn. 1988), cert. denied, 489 U.S. 1072, 109 S. Ct. 1357 (1989); State v. Poe, 755 S.W.2d 41, 45 (Tenn. 1988), cert. denied, 490 U.S. 1085, 109 S. Ct. 2111 (1989); Kennedy v. State, 186 Tenn. 310, 319, 210 S.W.2d 132, 136 (1947), cert. denied, 333 U.S. 846, 68 S. Ct. 659 (1948).

[12] The venire completed an extensive questionnaire prior to voir dire. Pursuant to the Appellant's request, the questionnaire included multiple inquiries regarding mental health issues. Of relevance to this issue:

Question Number 44 Do you believe that diagnosis or treatment provided by a psychiatrist or psychologist or other qualified professional might be helpful?
Question Number 45 Have you, anyone in your family or close personal friend ever received any type

(continued...)

The court denied the Appellant's request to question jurors during individual voir dire regarding mental health issues, but stated, "that is something that you can deal [with] within the general voir dire." The trial court additionally informed defense counsel that during the individual voir dire they could ask the general question, "Will you consider all mitigation?" and also permitted the parties to question the potential jurors regarding any matters that the jurors had designated as "private" on their questionnaires. Regarding group voir dire, the trial court limited inquiry into mental health issues, requiring any question to be an attempt to clarify a position stated in the questionnaire or be a general inquiry regarding the juror's ability to consider mental health testimony.[13] The Appellant now contends that the limitations placed on voir dire prevented him from developing possible cause challenges against jurors who had already expressed negative attitudes about mental health evidence,[14] thereby rendering the limitations essentially meaningless.

We cannot conclude that the trial court abused its discretion. Defense counsel had access to the questionnaires of the prospective jurors. The questionnaires combined with the permissible inquiries as to mental health issues during individual and group voir dire provided the Appellant with ample background information from which to exercise peremptory challenges. Accordingly, we find that the limited restrictions placed upon the parties by the trial court were reasonable and were well within the trial court's discretion. This issue is without merit.

### 2. Court Implied to Venire that Appellant was Guilty
The Appellant cites to numerous statements by the trial court which he asserts "implicitly conveyed that the court expected the [Appellant] to be found guilty of first-degree murder, so that a penalty phase would necessarily occur thereafter." The Appellant contends that the inference from the trial court's directions to the venire implied that the court "viewed the [Appellant's] convictions as a foregone conclusion." Accordingly, he avers that the court's comments resulted in prejudice to the judicial process requiring reversal. See Tenn. R. App. P. 36(b).

---

[12](...continued)
of inpatient or out-patient mental health counseling or treatment?
Question Number 46 Have you, any member of your family . . . or close personal friend ever taken any type of psychotropic drug or other medications for depression, anxiety or any other psychological or psychiatric problem or disorder?
Question Number 47 Have you ever had an unpleasant experience or confrontation with someone who suffered from any type of mental illness or emotional disorder, or someone who has lost control of their behavior?
Question Number 48 Do you hold an opinion about defendants who use mental health as an excuse for their actions?

[13]The court's restrictions during group voir dire arose from the court's concern over the recent case of State v. Reid, 981 S.W.2d 166 (Tenn. 1998)(notice requirements of intent to use mental health evidence as mitigation and ability to withdraw notice of intent at any time prior to presenting such evidence), and unfair disadvantage to the State.

[14]The Appellant specifically refers to prospective jurors Hodges and Fears. Again, based upon his failure to exercise all available peremptory challenges, the Appellant has waived any challenge to individual jurors.

Without reiterating verbatim the challenged language of the trial court to the venire, we acknowledge that the court, for example, used the term "**until** he is found guilty beyond a reasonable doubt of murder in the first-degree" rather than the term "**unless** he is found guilty beyond a reasonable doubt of murder in the first-degree." The Appellant argues prejudice without considering the context in which the court's statements were provided. Indeed, one challenged comment of the court, placed in full context of the court's instruction, provided:

> Mr. Reid hasn't been found guilty of anything. That is what the trial is about, so I want to make certain that you understand he is presumed innocent as he sits in front of you, and that presumption stays with him until he is found guilty after you hear the proof in the case, so just because we are asking you questions with regard to the possible punishments in this case, I want to make certain you keep in mind that he has not been found guilty of anything, but the reason we have to ask you these questions is that we must have jurors who can consider all three possible punishments.

We disagree with the Appellant's argument that this instruction compels the finding that the court implied to the jury the Appellant's guilt. Given the entire context of the voir dire, we conclude that no reasonable juror could have believed that the court was instructing him or her to return a guilty verdict. This issue is without merit.


### III. Sufficiency of the Evidence

The Appellant argues that the evidence presented at trial is insufficient to support his convictions for two counts of first-degree murder and one count of especially aggravated robbery. Specifically, the Appellant asserts that the "physical evidence and the testimony of prosecution witnesses raise reasonable doubts as to his identity as the perpetrator." We disagree and find the evidence more than sufficient to support the verdicts.

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. See generally State v. Adkins, 786 S.W.2d 642, 646 (Tenn. 1990); State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn

therefrom. Harris, 839 S.W.2d at 75. In State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1990), this court held these rules applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

The Appellant was convicted of two counts of premeditated first-degree murder, two counts of felony murder and one count of especially aggravated robbery. Initially, we note that, where the jury returns guilty verdicts as to alternative counts of first-degree murder, the two verdicts merge into one count of first-degree murder. See Carter, 958 S.W.2d at 624-625; see also supra, at footnote 1. Accordingly, a general verdict of guilty is sustainable if any one count in the indictment is supported by the proof. See Tenn. Code Ann. § 40-18-111; see also supra, at footnote 1. Thus, proof of either felony murder or premeditated murder is sufficient to sustain the conviction. See supra, at footnote 1. First-degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Tennessee Code Annotated section 39-13-202(d) defines premeditation as follows:

As used in subdivision (a)(1) 'premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. State v. Suttles, 30 S.W.3d 252, 260 (Tenn. 2000). Furthermore, robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (1997). In order for the robbery to be elevated to especially aggravated robbery, the robbery must be accomplished with a deadly weapon and the victim must suffer serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1)(2) (1997).

We agree with the Appellant that the identity of the defendant as the perpetrator is certainly an indispensable element of any crime. The determination of identity is a question of fact for the jury after a consideration of all competent evidence. See Biggers v. State, 219 Tenn. 553, 411 S.W.2d 696, 697 (Tenn.), cert. granted, 390 U.S. 404, 88 S. Ct. 979 (1968) (affirmed on other grounds); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451 (Tenn. 1958); State v. Crawford, 635 S.W.2d 704 (Tenn. Crim. App. 1982). The evidence offered to prove identity, however, can be either direct or circumstantial. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975); State v. Shelley, 628 S.W.2d 436, 438 (Tenn. Crim. App. 1981). Before an accused may be convicted upon circumstantial evidence alone, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." Howell, 868 S.W.2d at 253-254. Additionally, the determination of whether all reasonable

theories are excluded by the circumstantial evidence presented is primarily a question of fact for the jury. Pruitt v. State, 460 S.W.2d 385 (Tenn. Crim. App. 1970).

This case is based entirely upon circumstantial evidence. Upon reviewing the record, we find the evidence legally sufficient to support the jury's verdict of both premeditated first-degree murder and especially aggravated robbery. The record reflects that the Appellant told a co-worker prior to the crime that there were additional ways to make money, such as robbing fast food restaurants. The Appellant had also asked a friend to help him obtain a .32 caliber revolver prior to the crimes. After the crimes, the Appellant told a friend he owned a .32 caliber revolver and did not like the way it shot. Both victims were killed using a .32 caliber weapon. The Appellant worked near the location of the murders, was familiar with the location, and was a restaurant employee. The night before the murders, the Appellant obtained a job application from a Captain D's employee, who informed him to come back the next day and speak with the manager, Steve Hampton. The Appellant and his vehicle were identified by two witnesses as being outside Captain D's on the morning of the murders. Approximately $7,140 in cash and coins was taken during the Captain D's robbery. Although the Appellant was experiencing serious financial trouble prior to the crime, he spent in excess of $6,000 in cash approximately two weeks after the crime. A large amount of coined money was taken during the crime, and over $1,000 in coins was found at the Appellant's residence. Moreover, the Appellant's fingerprint was found on Steve Hampton's movie card which had been discarded on a nearby road. Considering these facts in the light most favorable to the State, we conclude that the proof in the record points the finger of guilt unerringly at the Appellant and the Appellant alone, and that the proof was sufficient for a jury to have found the essential elements of the offenses beyond a reasonable doubt. This issue is without merit.

## IV. Evidentiary Issues: Guilt Phase

### A. Admissibility of Testimony of Sergeant Hunter

The Appellant argues that the trial court erred by permitting Sgt. Johnny Hunter to testify as an expert witness in the field of blood spatter analysis. Specifically, the Appellant contends that this testimony violated his constitutional right to a fair trial because the defense was unfairly surprised. We disagree and find no error.

Sgt. Hunter was qualified by the court to testify as an expert on fingerprint analysis and comparison, as well as blood spatter analysis. The Appellant complains that he received no advance notice that the State was intending to introduce expert testimony in the field of blood spatter analysis and that he was denied the opportunity to effectively cross-examine the witness. Sgt. Hunter's report, which was provided to the defense prior to trial, mentioned that no visible blood spatter was found, with the exception of a small amount of blood on the floor around the victims. At trial, Sgt. Hunter testified about blood patterns found on the floor and surrounding area, specifically noting the absence of blood spattering. Sgt. Hunter further testified that the absence of blood spattering indicated that the victims were lying on the ground when they were

shot. He further stated that the blood pattern on a shelf to the right of one of the victims, Sarah Jackson, indicated that she had attempted to lift herself up after being shot.

The Appellant is not contesting Sgt. Hunter's qualifications, but rather insists that he was surprised by his testimony in this respect. Although the Appellant argues that he had no notice that Sgt. Hunter would testify about blood spattering at trial, the Appellant fails to explain how he was prejudiced by this testimony. Over a year before trial, the Appellant was provided with a copy of Sgt. Hunter's report, which stated that a small amount of blood was found on the floor near the victims. The Appellant cannot complain about Sgt. Hunter's testimony simply because he failed to find any significance in the report which was properly and timely provided to him by the State. This issue is without merit.

### B. Testimony of TBI Agent Linda Littlejohn Regarding Length of Shoes Seized

The Appellant argues that the trial court erred by allowing Tennessee Bureau of Investigation Agent, Linda Littlejohn, to testify that the length of the shoes seized from the Appellant's apartment were within the range of the unidentified shoe print left at the scene of the crime. Specifically, he contends that the technique used in "measuring" the enlarged photographic negative was not shown to meet the standards of admissibility for expert testimony set forth in McDaniel v. CSX Transp., 955 S.W.2d 257 (Tenn. 1997). Additionally, the Appellant asserts that the admission of Agent Littlejohn's testimony violated Tenn. R. Evid. 702 and 401.

Determinations of the admissibility of expert testimony are made within the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). The standard of review on appeal is whether the trial court abused its discretion in excluding the expert testimony. The abuse of discretion standard contemplates that, before reversal, the record must show that a judge "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999); State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

In the present case, Agent Littlejohn testified that a ruler was placed near the shoe print found at the crime scene before the photograph was taken. The negatives were later developed and "one to one photographs were made, and that would be where the negative is enlarged to where the ruler in the photograph is actually the same size of the ruler next to the print at the scene, so the photographs . . . would be exactly the same size as the print at the crime scene." Both tread and length were determined using this same technique. After comparing the photograph and the shoes, Agent Littlejohn testified that none of the treads on the shoes recovered from the Appellant's apartment matched the print left at the crime scene. Although Agent Littlejohn testified that she could not speculate as to the actual size of the shoe worn by the perpetrator because different styles and brands would vary slightly in length, she did testify, however, that the length of the shoe print found at the scene fell within the range of lengths of the nine pairs of shoes seized from the Appellant's apartment. Specifically, she testified that the shoe print found at the scene measured 12

and 3/8 inches in length. The shoes taken from the Appellant's apartment ranged from 11 13/16 inches to 12 ½ inches in length.

First, the Appellant contends that the trial court erred in admitting Agent Littlejohn's testimony regarding the length of the shoe print because it did not comport with standards for expert testimony set forth in McDaniel, 955 S.W.2d at 257. We note that the Appellant does not contest this measurement technique with respect to the tread identification testimony, which was favorable to him. Rather, he only attacks this technique with respect to the length of the shoe print. The Appellant further argues that the trial court erred by violating Tenn. R. Evid. 702, which reads, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."

In McDaniel, the Tennessee Supreme Court held that a trial court may consider the following factors when determining the reliability of scientific evidence: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. McDaniel, 955 S.W.2d at 265. In this instance, the following dialogue took place during a jury-out hearing:

THE COURT:     Well, let me ask Ms. Littlejohn a couple of questions. Ms. Littlejohn, the training that you had in terms of the conclusions that you drew, were these standard procedures used in that field?

LITTLEJOHN:     Yes, I mean - -

THE COURT:     Okay, and it is the blowing up, the one-on-one comparison - -

LITTLEJOHN:     Uh-huh.

THE COURT:     - - and is that what your training indicates?

LITTLEJOHN:      . . .yes, ma'am.

| | |
|---|---|
| THE COURT: | And is that the standard used in your field? |
| LITTLEJOHN: | Yes, it is. |
| THE COURT: | All right, and is there scientific literature with regard to this, I mean - - |
| LITTLEJOHN: | Yes, there is. |
| THE COURT: | - - and is this subject to being able to be proven or disproved? |
| LITTLEJOHN: | Yes. |
| THE COURT: | Okay, so there are scientific principles behind this? |
| LITTLEJOHN: | Yes. |
| THE COURT: | So you blow it up one-on-one, which is the exact size of the print, and then you just make a comparison of both in tread and otherwise, and apparently you did that in this case that [defense counsel] does not object to? |
| LITTLEJOHN: | Yes, your honor. |
| DEFENSE: | Correct. |
| THE COURT: | Okay, so you used that same methodology to compare the prints, the tread, and that, that you used to make the size comparison? |
| LITTLEJOHN: | Basically. . . . |

We conclude that the above text, along with other testimony presented at the jury-out hearing, more than satisfies the factors set forth in McDaniel.  The evidence presented at both the jury-out hearing and trial indicated that the technique used by Agent Littlejohn was standard procedure and widely accepted in the field of shoe and footprint comparison.  Agent Littlejohn properly qualifies

-30-

as an expert in shoe and footprint comparison and her testimony would have substantially assisted the trier of fact due to her education, experience, and training. See Tenn. R. Evid. 702. Moreover, the Appellant was able to solicit testimony during cross-examination that the length of the print found would be fairly common among the general population. This issue is without merit.

The Appellant also argues that Agent Littlejohn's testimony concerning range of length was irrelevant. See Tenn. R. Evid. 401 and 402. Tennessee Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Clearly, testimony concerning the shoe prints found at the crime scene as compared to the shoes seized from the Appellant's apartment is relevant evidence that was properly admitted. This issue is without merit.

### C. Admissibility of Cash Register Receipts Seized from Appellant's Residence

The Appellant argues that the trial court erred in admitting into evidence cash register receipts seized from the Appellant's residence that were not properly authenticated pursuant to Tenn. R. Evid. 901. Specifically, he contests the authentication of the receipts because the prosecution failed to call as witnesses representatives of the respective businesses to testify as to the legitimacy and accuracy of the receipts. The prosecution, through the testimony of Detective Postiglione, introduced three cash register receipts seized from the Appellant's residence: (1) a Wal-Mart receipt in the amount of $78.34, dated February 17, 1997; (2) a Wal-Mart receipt dated the same day in the amount of $69.29; and (3) a receipt from Jumbo Sports dated February 18, 1997, for $97.41. The purpose for the introduction of these receipts was to show that the Appellant had spent a large amount of money in a short period of time after the murders despite the fact that he was in dire financial trouble at the time. At trial, defense counsel objected to the introduction of the receipts, arguing that the receipts had not been properly authenticated. The trial court overruled the objection and found the cash register receipts admissible. Upon reviewing this issue, we agree that the receipts were admissible.

Rule 901(a) of the Tennessee Rules of Evidence provides that "[t]he requirement of authentication . . . is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Notwithstanding, Rule 902(7) states that extrinsic evidence of authenticity is not required as a condition precedent to admissibility when the item or items sought to be admitted are "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control or origin." In the present case, two of the receipts were from Wal-Mart and one receipt was from Jumbo Sports. All three receipts were in printed form, bearing the retailer's name, address, and other relevant information. This printed material constitutes an "inscription" for purposes of satisfying Rule 902(7). See, e.g., United States v. Hing Shair Chan, 680 F. Supp. 521, 526 (E.D.N.Y. 1988)(a hotel record on hotel stationary was held to be self-authenticating); State v. Deleon, No. CA 17574, 2000 WL 646502 (Ohio App. 2d. May 19, 2000)(bill of sale for automobile bearing dealer's name and address held to be self-authenticating); Neil P. Cohen, et. al., *Tennessee Law of Evidence* §§ 9.02[9] (4th ed. 2000). Thus, the cash register receipts were self-authenticating and properly admitted at trial. This issue is without merit.

# V. Closing Argument at Guilt Phase

## A. *Prosecutorial Comment on Appellant's Failure to Testify*

The Appellant argues that the trial court erred by denying defense counsel's motion for a mistrial when, during closing arguments of the guilt/innocence phase, the prosecution commented on the Appellant's failure to testify. A prosecutor is strictly prohibited from commenting on the defendant's decision not to testify. State v. Coker, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). However, a prosecutor's statement that proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify. State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App.1991); Coury, 697 S.W.2d at 378.

In the present case, the Appellant did not testify at trial. However, a videotaped statement to the detectives following the Appellant's arrest was played before the jury. In this tape, the Appellant stated that he did not know how his fingerprint got on Hampton's Movie Gallery card. Nonetheless, he also told detectives "I'm not surprised that it is on there." During closing arguments of the guilt/innocence phase, defense counsel made the following statements:

> I believe the evidence showed that card was found the next day, over 24 hours after the robbery happened. You heard that it was found on Ellington Parkway, about a mile from [the Appellant's] house. You heard that [the Appellant] had a car that broke down all the time. If a person was near something and your car breaks down and you walk by something, you might pick that up and throw it back down. Four months after the fact, you may not even remember that.

Additionally, defense counsel questioned the prosecution's reasoning for playing the videotaped statement during trial. In its closing arguments, the prosecution responded to defense counsel's comments as follows:

> [Defense counsel] talked about why did the State put in the statement. Because he gave it, and you, as jurors, have a right to hear it. You did hear it, and we put in on for one reason; because he was given chance after chance to explain how his fingerprint could have gotten on that card. He said I'm not surprised it is on there. *Would he ever have an explanation*? [Defense counsel] grabbed one out of the air, and there is no basis in fact or evidence for anything else, and said, well maybe his car broke down.

(Emphasis added). The Appellant maintains that the prosecution's statement of "When would he ever have an explanation?" clearly commented upon the fact that the Appellant failed to explain during his statement to police the presence of his fingerprint on property that had been in the possession of one of the victims. Additionally, he contends that the prosecutor wrongfully commented on the Appellant's failure to take the witness stand and offer an explanation at trial. We disagree. This was clearly rebuttal argument directed toward defense counsel's earlier argument that the Appellant could have picked up the movie card while walking after his car broke down. We do

-32-

not find that the statement can be fairly characterized as a comment on the Appellant's failure to testify. At most, the comment was mere argument by the prosecution that its proof was unrefuted or uncontradicted. See Coury, 697 S.W.2d at 378. This issue is without merit.

### B. Prosecutorial Comment During Closing Arguments

The Appellant argues that the trial court erred by overruling defense counsel's objection to the prosecution's statement during closing argument that the Appellant's foot was the "same size" as shoe prints left at the scene. Specifically, the Appellant contends that the comment was prejudicial "because the prosecutor's comments constituted a misstatement of the evidence on a crucial matter."

Closing arguments are an important tool for the parties during the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, see State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), and trial judges, in turn, are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). To justify a reversal on the ground of improper argument of counsel, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). Furthermore, the following factors must be considered by this court in making such a determination: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. Bigbee, 885 S.W.2d at 809; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In the present case, Agent Littlejohn testified that the unidentified shoe print found at the crime scene was within the range of the length of shoes seized from the Appellant's residence. She also testified that it is common for the same "shoe sizes" to vary in length based upon the brand name and manufacturer of the shoe. Accordingly, Agent Littlejohn declined to specifically identify the shoe print as being a particular size. Because the shoes taken from the Appellant's apartment ranged in length from 11 and 13/16 inches to 12 and ½ inches, Agent Littlejohn testified that she had no doubt that the shoe print found at the scene, which measured 12 and 3/8 inches in length, fell within the range of length of shoes taken from the Appellant's apartment. Thus, the Appellant could not be excluded from having left the print.

During closing arguments of the guilt/innocence phase, the prosecution made the following three comments with respect to the Appellant's "shoe size":

More than likely, it was the killer, and could that print have excluded [the Appellant] if it [sic] was the killer? Of course, if it was a size 7 or a size 8 or a size 9, but it fit in the *size of the shoe* [the Appellant] wears.

\*\*\*

The footprint could have excluded him. The *same size* of [the Appellant].

\*\*\*

Who has a footprint the *same size* as the one left at the crime scene? [The Appellant].

(Emphasis added). The Appellant argues the above comments made by the prosecution were prejudicial and misrepresented the proof. We disagree. The prosecutor never referred to the unidentified shoe print as being a particular size. While it might have been more preferable for the prosecution to use the terminology "within range of length of [ the Appellant's] shoes" instead of "same size," it is clear from the record before us that the prosecution was simply referring to Agent Littlejohn's testimony where she explained that the crime scene shoe print fell within the range of shoes seized from the Appellant. As the trial court correctly noted, "the State did nothing more than argue its position that, because the length of the unknown print was not inconsistent with the length of the [Appellant's] shoes, the [Appellant] could not be excluded as the perpetrator." Moreover, we note that the trial court also cautioned the jury that "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." As such, we find no evidence of prosecutorial misconduct, nor do we find error which prejudiced the Appellant. Thus, this issue is without merit.

## VI. Instructions on Lesser-Included Offenses

The Appellant argues that it was error for the trial court to deny his request for jury instructions as to the lesser-included offenses of facilitation of first-degree murder and facilitation of especially aggravated robbery. With respect to the premeditated first-degree murder charges, the court instructed the jury on the lesser-included offense of second-degree murder. With respect to the especially aggravated robbery charges, the court instructed the jury on the lesser-included offense of aggravated robbery. The trial court, however, declined to instruct the jury on the lesser-included offense of facilitation.

Initially, we note that, in Tennessee, irrespective of a party's request for a lesser-included jury instruction, "[I]t is the duty of all judges charging juries in cases of criminal prosecutions for any felony . . . to charge the jury as to all of the law of each offense included in the indictment." Tenn. Code Ann. § 40-18-110(a) (1997). Moreover, as the State concedes, facilitation is a lesser-included offense of both first-degree murder and especially aggravated robbery. See generally State v. Burns, 6 S.W.3d 453 (Tenn. 1999). This fact alone, however, is not dispositive of whether error occurred. See generally Burns, 6 S.W.3d at 463.

Determining whether a lesser-included offense must be charged in the jury instructions is a two-part inquiry. Burns, 6 S.W.3d at 469. First, the court must determine whether any evidence exists that reasonable minds could accept as to the application of a lesser-included offense. Id. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Id. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. Id. at 467-469.

Criminal responsibility for facilitation of a felony is defined in Tenn. Code Ann. § 39-11-403 (1997) and reads as follows:

> (a) A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

We are unable to conclude under the test announced in Burns that reasonable minds could find that anyone other than the Appellant was involved in this crime. Neither the prosecution nor the defense advanced the theory that the Appellant was criminally responsible for facilitating the acts of another at trial. To the contrary, it was the prosecution's theory that the Appellant was solely responsible for both the murders and the robbery. At trial, the Appellant, in his defense, asserted the position that the prosecution failed to establish his identity as the perpetrator.

On appeal, the Appellant gives several reasons why he was entitled to the lesser-included instructions. First, the Appellant points to his statement to police where he says, "I am not the triggerman." This statement, however, in no way indicates the participation of another person. Second, the Appellant points to his statement where he says he did not know the victims but was "not surprised" his fingerprint was on the victim's Movie Gallery card. He also insists the bloodhounds' tracking of a scent from the location of the card to a nearby residence implicates the involvement of another person. Once again, we do not interpret this to mean another person was involved. Moreover, no evidence was presented at trial to support this contention. Third, the Appellant argues that another person could have been involved because there were many unidentified fingerprints left at the crime scene. The crime scene was a public restaurant and it is expected that many unidentifiable fingerprints would be found at such a location. Fourth, the Appellant points to the fact that one shoe print was never identified. Once again, it is expected in a public restaurant to have many prints, whether fingerprints or shoe prints, that belong to unidentified persons. Fifth, the Appellant maintains that cigarettes were found in an ashtray in the restaurant. The proof at trial, however, indicated that the cigarettes were found at the employees' break station and had not been removed the night before when the employees went home. Sixth, the Appellant argues that his friend, Danny Tackett, testified that he and the Appellant had previously discussed committing robberies against fast food restaurants. Seventh, the Appellant points to the testimony of Mark Farmer, who testified at trial that it was "possible" that someone else could have been in the driver's side of the car. However, he did not testify that there was, or that he thought there was another

person in the car. Instead, he only acknowledged that it would have been possible. Finally, the Appellant argues that the composite drawings do not resemble him. The evidence at trial, however, indicates that the drawings were similar and that many features between the composite drawings and the Appellant match.

We find that no reasonable juror could have accepted that the evidence presented in any manner established the commission of the lesser-included offense of facilitation. To the contrary, the entire case is centered around the Appellant as the sole perpetrator and the Appellant's defense of not being involved. Thus, the trial court properly declined to instruct the jury on the lesser-included offenses of facilitation of first-degree murder and facilitation of especially aggravated robbery. This issue is without merit.

## VII. Late Night Court Sessions

The Appellant argues that the trial court committed reversible error by holding numerous "late night" court sessions. Specifically, the Appellant maintains that the late night sessions caused his attorneys to be tired and less effective than they normally would have been had they been given the opportunity for more rest. In State v. Parton, 817 S.W.2d 28, 33 (Tenn. Crim. App. 1991), this court addressed the issue of "late night" court sessions as follows:

> It is clear in this state that late night court sessions should be scheduled "only when unusual circumstances require it." McMullin, 801 S.W.2d at 832. Regardless of whether counsel or any juror objects, the late night sessions should be avoided; and they must be justified because of unusual circumstances. If the requisite unusual circumstances do exist and late night sessions are scheduled because of necessity, good practice would be to also let the record affirmatively reflect that all counsel and all jurors expressly agree. But the threshold question which must always be determined by the court is whether the circumstances justify the unusual session.

First, we note that this issue has been waived for failure of defense counsel to object to the late hours at trial and for defense counsel's failure to raise this issue in the motion for new trial. See Tenn. R. App. P. 36(a). Notwithstanding the waiver, however, we find that the record does not support the Appellant's argument that the court kept excessively late hours during trial. During the two and one-half weeks of trial, sessions ran "late" on five of the thirteen nights. On the five "late nights," two of which were jury selection, court concluded between 8:30 and 9:25 p.m. We also note that during this period, there were five "off days" where neither counsel nor the litigants had to report to court. Further, this was a sequestered jury from a distant county. The Tennessee Supreme Court has held that a determination of how long into the evening a trial should last is a matter within the discretion of the trial court. See Poe, 755 S.W.2d at 47. Although these five days may exceed the "normal eight hour day," we do not find the sessions to be unreasonable in this particular case. This issue is without merit.

## VIII.  Evidentiary Issues at Penalty Phase

### A.  *Dr. Martell as Expert Witness*

During the penalty phase of the Appellant's trial, the State called Dr. Daniel Martell as a rebuttal witness and sought to qualify Dr. Martell as an expert in "forensic neuropsychology."[15] During voir dire of Dr. Martell, the State elicited testimony that Dr. Martell obtained both his master's degree and his Ph.D. at the University of Virginia and completed a forensic internship at Bellevue Hospital in New York City.  After his internship, he was awarded a postdoctoral fellowship to do advanced study and research in forensic neuropsychology.  From this fellowship, Dr. Martell founded the Forensic Neuropsychology Laboratory at Kirby Forensic Hospital in New York City, where he remained as director for the next eight years.  Dr. Martell then joined the clinical faculty at the Neuropsychiatric Institute at UCLA and also engaged in private consultation practice. Throughout his career, Dr. Martell has authored numerous papers outlining the relationship between neuropsychology and criminal law and has limited his professional practice to forensic neuropsychology.

Dr. Martell testified that board certification was currently unavailable in the field of "forensic neuropsychology" and there is no professional association for "forensic neuropsychologists."  Dr. Martell admitted that, although there is Board Certification and Recognition in the field of neuropsychology, he has never applied for board certification in the field of neuropsychology.  On this basis, the Appellant, while conceding Dr. Martell's qualifications as an expert witness in the field of psychology, objected to his qualification as an expert in the field of "forensic neuropsychology."   The trial court overruled the objection, accepting Dr. Martell's qualifications as an expert in the field of forensic neuropsychology.  The Appellant now challenges this ruling, alleging that "an expert is competent to testify 'only as to matters within the limited scope of his or her expertise and licensure.'" Appellant's Brief at 260 (citing Bolton v. CNA Ins. Co., 821 S.W.2d 932, 935 (Tenn. 1991)).  He contends that the "State never sufficiently established that Dr. Martell was an expert in the field of 'forensic neuropsychology.'"  Appellant's Brief at 261.

The determination of the qualifications of an expert witness and the relevancy and competency of expert testimony are matters generally entrusted to the sound discretion of the trial court.  State v. Anderson, 880 S.W.2d 720, 728 (Tenn.  Crim. App.), perm. to appeal denied, (Tenn. 1994); see also Tenn. R. Evid. 104(a).   This court will not overturn the trial court's decision absent a clear abuse of discretion.  Anderson, 880 S.W.2d at 728 (citing State v. Williams, 657 S.W.2d 405, 411 (Tenn. 1983), cert. denied, 465 U.S. 1073, 104 S. Ct. 1429 (1984)).

Rule 702 of the Tennessee Rules of Evidence provides "that in order to testify as an expert and thus be permitted to give conclusions and opinions on a matter involving scientific, technical or other specialized knowledge, a witness must possess sufficient 'knowledge, skill, experience, training, or education.'" Neil P. Cohen et al, *Tennessee Law of Evidence* § 7.02[4] at 7-21 (emphasis

---

[15]Dr. Martell explained that "forensic neuropsychology" is "the study of brain damage, and how it affects violent behavior."

added). The witness may acquire the necessary expertise through formal education or life experiences. Id. However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person. Id. (citations omitted).

The record in the present case clearly establishes that forensic neuropsychology is a recognized sub-specialty of psychology regardless of the availability of board certification in this area. It is equally clear that Dr. Martell is more than qualified to testify in this area of practice. Moreover, the issue of whether the courts of this state recognize experts in the area of forensic neuropsychology is not an issue of first impression. The courts of this state have previously permitted experts to testify in this area. See, e.g., Coe v. State, 17 S.W.3d 193, 205 (Tenn.), cert. denied, 529 U.S. 1034, 120 S. Ct. 1460 (2000) (defense presented Dr. Walker as expert witness in field of forensic neuropsychology); Victor James Cazes v. State, No. 02C01-9801-CR-00002 (Tenn. Crim. App. at Jackson, Dec. 8, 1999) (Dr. Martell testified as expert in field of forensic neuropsychology). Accordingly, we cannot conclude that the trial court abused its discretion in qualifying Dr. Martell as an expert in forensic neuropsychology.[16]

### B. Cross-Examination of Dr. Martell

Prior to Dr. Martell's testimony, the Appellant requested that he be permitted to question Dr. Martell regarding a letter written by Dr. Martell in 1997 to the United States Department of Justice. Relying upon Rule 405 of the Tennessee Rules of Evidence as grounds for the letter's admission, he argues that the letter was relevant to the witness' credibility and bias. The eight-page letter was Dr. Martell's request for a Department of Justice investigation into an incident that had led to rumors of unprofessional and possibly illegal conduct by Dr. Martell in a federal death penalty case.[17] In his letter, Dr. Martell repeatedly asserted his innocence of any wrongdoing and sought an investigation so that he could receive a letter of exoneration from the Department of Justice. Specifically, he emphasized that these allegations had damaged his professional reputation and threatened his "financial status." The allegations concerned an affidavit Dr. Martell had signed in a federal case. This affidavit was discussed by the attorneys and the judge in chambers.[18] Dr. Martell was denied the opportunity to hear the allegations or to defend himself if needed.

---

[16]Within his argument, the Appellant additionally alleges that the court's acceptance of Dr. Martell as an expert in the field of forensic neuropsychology undoubtedly resulted in prejudice to his case. Specifically, he asserts that, although he called Dr. Auble, a psychologist with similar training to that of Dr. Martell, he did not seek to qualify her as an expert in forensic neuropsychology. Accordingly, he argues that the jury likely gave Dr. Martell's testimony greater weight than Dr. Auble's testimony. Nothing prevented the Appellant from seeking to qualify Dr. Auble as an expert in forensic neuropsychology. He cannot now complain about an action which he failed to pursue. Tenn. R. App. P. 36(a).

[17]Members of the National Network of Capital Defense Attorneys alleged that, in the case of United States v. Spivey, Dr. Martell signed a false affidavit.

[18]The Appellant acknowledges that the allegation against Dr. Martell was by defense counsel in that matter and that there is no evidence that the allegation by defense counsel did, in fact, occur.

In denying admission of Dr. Martell's letter, the trial court found, in relevant part:

> It says I must determine that the questions are proposed in good faith rather than an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors. I'm going to determine that there is no reasonable factual basis for that inquiry.

The Appellant challenges the trial court's ruling, asserting that this information was admissible to show Dr. Martell's credibility and "goes to the prospect of bias." Like other evidentiary rulings, an appellate court reviews a trial court's ruling under Tenn. R. Evid. 608(b) using an abuse of discretion standard. See Ingram v. Earthman, 993 S.W.2d 611, 639 (Tenn. App. 1998), cert. denied, 528 U.S. 986, 120 S. Ct. 445 (1999); State v. Blanton, 926 S.W.2d 953, 959-60 (Tenn. Crim. App. 1996).

Character evidence may be used in limited circumstances to impeach a witness. See Tenn. R. Evid. 404(a)(3) (evidence of character of witness admissible as provided in Rules 607, 608 and 609). However, extrinsic evidence of conduct other than criminal conviction may not be used to attack the character of a witness. See Tenn. R. Evid. 608(b). Accordingly, Dr. Martell's letter was properly excluded as extrinsic evidence of Dr. Martell's character.

Moreover, certain conditions must be satisfied before allowing inquiry on cross-examination of the witness about specific instances of conduct probative solely of truthfulness or untruthfulness. See Tenn. R. Evid. 608(b). First, upon request, the court must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry. See Tenn. R. Evid. 608(b)(1). If these requirements are met, the court must then determine that the conduct, within limited exceptions, must have occurred no more than ten years before commencement of the action or prosecution. See Tenn. R. Evid. 608(b)(2).

In the present case, the court determined that no "reasonable factual basis" existed for the Appellant's inquiry. We agree. The Appellant offered no evidence of conduct by Dr. Martell evidencing untruthfulness. Rather, the only proof offered was a letter written by Dr. Martell requesting exoneration because of false rumors. The letter itself is not proof of Dr. Martell's untruthfulness. Where there is no factual basis for an inquiry into prior conduct of a witness, the court shall bar any such attempt to interrogate a witness based on mere speculation or rumor. See State v. Philpott, 882 S.W.2d 394, 404 (Tenn. Crim. App. 1994)( "An attempt to communicate by innuendo through questions which are answered in the negative is impermissible when the questioner has no evidence to support the question."); see also State v. Bowling, 649 S.W.2d 281, 283 (Tenn. Crim. App. 1983); Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.08[7][d]. Accordingly, we conclude that the trial court did not abuse its discretion in preventing inquiry into Dr. Martell's letter to the Department of Justice. Finally, we fail to see how the letter written by Dr. Martell establishes that Dr. Martell is biased in favor of the State or prejudiced against the Appellant. See Tenn. R. Evid. 616. This issue is without merit.

### C. Court's Refusal to Admit Tape-Recording to Rebut Dr. Martell's Testimony

During his testimony, Dr. Martell opined that the Appellant suffered from "delusional disorder, mixed type with persecutory and grandiose themes, in substantial remission." He qualified his diagnosis, however, noting that the Appellant has a lengthy history of malingering mental illness and that, in his opinion, the Appellant's delusional disorder was in remission. During cross-examination, defense counsel requested permission to introduce an audiotape of a June 1997 interview by Detective Postiglione of Ms. Dorothy Meadlin, the Appellant's former landlord. Dr. Martell, in forming his opinions of the Appellant, testified that he had reviewed and considered the contents of the audio taped interview. The trial court denied defense counsel's request, finding that the contents of the tape constituted hearsay and were "not appropriate." Specifically, the court stated:

> Mr. Engle, I'm not going to let you do this. It is just flat out not appropriate. I still don't understand why – why you don't call her as a witness? You could have called her as a witness, or you could call Detective Postiglione, if you had reason, in order to put that, in order to authenticate the tape, but to try to get the information of what she has to say in through [Dr. Martell], who is testifying as an expert about Mr. Reid's mental condition, I mean, just exactly what rule of evidence do you think this belongs to?

Defense counsel then sought to introduce a transcript of Ms. Meadlin's testimony provided by the State. The State objected, noting that the State had not provided defense counsel a transcript of the audio taped interview. At this point, defense counsel conceded that the transcript was supplied by the District Attorney's Office in another judicial district. In response to further inquiry by the court, defense counsel stated that he intended to ask Dr. Martell about the tape, whether he considered the tape in making his conclusions, and how he evaluated the tape. Defense counsel further added that he did not call Ms. Meadlin as a witness because she is sixty-eight years old and infirm. Although defense counsel conceded that he could have sought a deposition from Ms. Meadlin, he stated that he would rather seek admission of the interview through Dr. Martell. The court again refused admission of the tape.

The Appellant challenges the trial court's exclusion of the audiotape during the cross-examination of Dr. Martell. Specifically, the Appellant relies upon the premise that the rules of evidence do not preclude, at a capital sentencing hearing, evidence which establishes or rebuts an aggravating circumstance.

The Appellant is correct in his argument that evidence is not excluded at a capital sentencing hearing merely because the evidence is hearsay. See Tenn. Code Ann. § 39-13-204(c). Thus, as long as evidence or testimony is relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances and has probative value in the determination of punishment, such evidence is admissible. See State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995); see also State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999), cert. denied, – U.S. –, 121 S. Ct. 98 (2000). The admission of evidence, however, is not without constraints. Evidence may properly be excluded if it is so unduly prejudicial that it renders the trial fundamentally unfair. See

State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (Tenn. Crim. App. at Jackson, Mar. 14, 2000), aff'd by, No. W1998-00634-SC-DDT-DD (Tenn. at Jackson, Apr. 17, 2001) (citing State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998), cert. denied, 527 U.S. 1039, 119 S. Ct. 2402 (1999); State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999)). Additionally, the admissibility of evidence ultimately is entrusted to the sound discretion of the trial court. State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (citing Hutchinson, 898 S.W.2d at 172). Absent an abuse of that discretion, such rulings will not be reversed on appeal. State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (citing State v. Caughron, 855 S.W.2d 526, 541 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475(1993)).

Initially, we acknowledge that the record belies the Appellant's assertion that the audiotape's admission was sought to rebut the testimony of Dr. Martell. The record is abundantly clear that the Appellant had every opportunity to question Dr. Martell regarding his consideration of the audiotape interview of Ms. Meadlin in making his diagnosis of the Appellant, yet he failed to avail himself of such opportunity. See generally Tenn. R. App. P. 36(a). Additionally, the Appellant fails to offer any valid reason as to why a deposition of Ms. Meadlin was not requested or as to why Detective Postiglione was not called to testify regarding his interview of Ms. Meadlin. See generally Tenn. R. App. P. 36(a). Finally, we fail to comprehend the Appellant's assertion that Ms. Meadlin's statement would rebut Dr. Martell's conclusion that the Appellant's delusional disorder was in substantial remission in the late 1990's when the incidents discussed by Ms. Meadlin occurred in the early 1990's. For these reasons, we cannot conclude that the trial court abused its discretion in excluding introduction of the audiotape interview of Ms. Meadlin. This issue is without merit.

### D. Cross-Examination of Janet Kirkpatrick
Prior to trial, the defense team interviewed the Appellant's sisters. A summary of the joint interview was provided to the Appellant's experts, the State's experts, and the prosecuting attorneys. During the penalty phase of the trial, the Appellant's sister, Janet Kirkpatrick, testified for the defense. Ms. Kirkpatrick, on direct examination, discussed many of the same topics mentioned during her prior interview, including her acknowledgment that the Appellant had previously been incarcerated. Prior to cross-examination of Ms. Kirkpatrick, the State approached the bench and inquired whether the witness could be impeached with other information provided during the interview since the defense had questioned her about information obtained from the interview.

During cross-examination, the prosecutor asked Ms. Kirkpatrick whether, during her interview with the defense team, she had indicated that she "was aware that during an attempt to rob a restaurant, [the Appellant] was putting one of the victims in the freezer."[19] At this point, the defense team objected and a jury-out hearing was conducted. Ms. Kirkpatrick denied making any such statement during the interview. Rather, she stated that her sister made the statement based upon a newspaper article she had read. Although she agreed that the report indicated both sisters' knowledge of the incident, Ms. Kirkpatrick maintained that she merely agreed with her sister.

---

[19]This incident which resulted in the Appellant's arrest and conviction occurred in Texas.

Defense counsel then moved for a mistrial. The trial court ruled that the prosecutor's comment was improper but denied the Appellant's request for a mistrial.

When the jury returned to the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen of the jury, before you went upstairs for your afternoon break, General Thurman had asked a question of this witness. I sustained an objection, and that information is now stricken from the record. You may not consider that for any reason, and you must treat it as if you had never known it.
>
> Again, I remind you that you may not consider allegations of criminal behavior or prior crimes with regard, that you've been hearing this afternoon, except as to how it relates to the mental health of the defendant. The State is relying upon the prior conviction for its aggravating circumstance involving the robbery charge that was committed on the dates on the certified copy, and you may not consider other crimes or other criminal behavior for any reason, other than the mental condition of the defendant.

Despite the instruction, the Appellant submits that the trial court erred in denying his motion for a mistrial. Specifically, he contends that the prosecutor's question informing the jury that the Appellant had previously attempted to commit a crime under circumstances almost identical to the instant case was so prejudicial that the trial court's curative instruction could not remove the taint of the statement.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. See State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In reviewing a trial court's denial of a motion for mistrial, this court will not disturb that decision unless there is an abuse of discretion. Adkins, 786 S.W.2d at 644; Williams, 929 S.W.2d at 388.

In the present case, the Appellant has shown no manifest necessity that would require a mistrial. We cannot conclude that the information was so prejudicial that a mistrial should have been granted. In measuring the prejudicial impact of any misconduct on behalf of the prosecutor in asking the question, this court should consider the facts and circumstances of the case; any curative measures undertaken by the court and the prosecutor; the intent of the prosecutor; the cumulative effect of the improper conduct and any other errors; and the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also Buck, 670 S.W.2d at 609. In the present case, there was considerable evidence regarding the Appellant's culpability in other violent crimes prior to the question of the State. The Appellant had already been found guilty by the jury and the jury had already been presented with substantial proof of the aggravating circumstances. The Appellant does not contest the aggravating circumstance, previous conviction for a violent

felony. Finally, the trial court provided the jury with an instruction that they were to disregard the information of the felony charge. We presume that the jury followed the trial court's explicit instruction not to consider the inappropriate evidence. State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994), cert. denied, 516 U.S. 829, 116 S. Ct. 99 (1995).

Under these circumstances, we hold that the trial court did not abuse its discretion when it denied the motion for a mistrial. The record does not support a conclusion that a miscarriage of justice occurred by continuing the trial after the prosecutor's improper questions. See State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). This issue has no merit.

### IX. Introduction of Victim Impact Evidence

In State v. Nesbit, 978 S.W.2d at 889, our supreme court held that "victim impact evidence and argument is [not] barred by the federal and state constitutions." See also Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991) (holding that the Eighth Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument); State v. Shepherd, 902 S.W.2d 895, 907 (Tenn. 1995) (holding that victim impact evidence and prosecutorial argument not precluded by the Tennessee Constitution). Notwithstanding the holding that victim impact evidence is admissible under Tennessee's death penalty sentencing scheme, the introduction of such evidence is not unrestricted. Nesbit, 978 S.W.2d at 891. Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair; or (2) its probative value is substantially outweighed by its prejudicial impact. See Nesbit, 978 S.W.2d at 891 (citations omitted); see also State v. Morris, 24 S.W.3d 788, 813 (Tenn. 2000) (Appendix), cert. denied, – U.S.–, 121 S. Ct. 786 (2001). Additionally, our supreme court has established certain procedural guidelines which must be followed before victim impact evidence may be admitted by the trial court. First, the State must notify the trial court of its intent to produce victim impact evidence. Nesbit, 978 S.W.2d at 891. Second, upon receiving the State's notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence. Id. Finally, the trial court should not permit introduction of such evidence until the court determines that evidence of one or more aggravators is already present in the record. Id.

At the sentencing hearing, the State presented the testimony of Deanna Hampton, the wife of victim Steve Hampton, and Pamela Sue Guidry, Steve Hampton's mother. Deanna Hampton testified that Steve Hampton was twenty-five years old at the time of his murder. He was the father of three young children. Deanna Hampton testified that the death of her husband caused her to withdraw from everybody, including her children, and that both she and her children have received counseling. Pamela Sue Guidry testified that Steve Hampton was her only child. She stated that she will never be able to get over her son's death. Additionally, members of victim Sarah Jackson's family testified as to how her death has devastated their lives. Both of Sarah Jackson's parents testified that they have suffered psychologically because of her death. Both parents feel guilty about permitting their daughter to take a job when she was sixteen. Sarah Jackson's brother, Wayne, testified that his sister's murder has made him extremely angry. He explained the difficulty his

family was having during the holidays coping with his sister's loss. Wayne Jackson also stated that his younger brother was in denial about the murder. The Appellant challenges admission of this victim impact evidence on grounds that (1) State v. Nesbit should not have been applied in this case; (2) the instruction mandated in State v. Nesbit conflicts with the statute and, therefore, should not have been given; and (3) the victim impact evidence provided in the instant case exceeds the parameters established in State v. Nesbit.

### A. *Application of State v. Nesbit*

The Appellant acknowledges that neither the Tennessee Constitution nor the United States Constitution bar the introduction of victim impact evidence. Nesbit, 978 S.W.2d at 899 (citing Shepherd, 902 S.W.2d at 907; State v. Brimmer, 876 S.W.2d 75, 86 (Tenn.), cert. denied, 513 U.S. 1020, 115 S. Ct. 585 (1994)). Nonetheless, he argues that State v. Nesbit, is inapplicable because the crimes for which he was convicted occurred prior to the supreme court's decision in Nesbit. This argument is advanced notwithstanding the fact that the statute reviewed by our supreme court in Nesbit is the same statute applicable in this case.[20]

In State v. Nesbit, our supreme court, analyzing the statute in effect in 1997, determined that "the language of the statute is broad." Nesbit, 978 S.W.2d at 891. Indeed, the court, although cognizant of its holding in Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979)(evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant), found that the court had consistently recognized that "a sentencing jury must be permitted to hear evidence about the *nature and circumstances of the crime* even though the proof is not necessarily related to a statutory aggravating circumstance." Nesbit, 978 S.W.2d at 890 ( citing State v. Harris, 919 S.W.2d 323, 331 (Tenn. 1996); Teague, 897 S.W.2d at 251; State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994); Bigbee, 885 S.W.2d at 813 (citing cases)) (emphasis in original). In this regard, the court held that "the impact of the crime on the victim's immediate family is one of those myriad of factors encompassed within the statutory language *nature and circumstances of the crime*." Nesbit, 978 S.W.2d at 890 (emphasis in original).

---

[20]At the time the Appellant's offenses were committed, the following statute was in effect:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Tenn. Code Ann. § 39-13-204(c ). In 1998, the capital sentencing statute was amended specifically to permit victim impact testimony. See Tenn. Code Ann. § 39-13-204 (Supp. 1998) ("The court may permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. Such evidence may be considered by the jury in determining which sentence to impose."). In the present case, the State agreed not to rely upon the amended statute to introduce victim impact evidence.

-44-

Accordingly, under the court's holding, the 1997 statute permitted the introduction of victim impact testimony as part of the nature and circumstances of the murder. In making his argument, the Appellant is essentially asking this court to overrule the Tennessee Supreme Court which we are obviously unable to do.

Within his challenge to the applicability of State v. Nesbit, the Appellant contends that the application of State v. Nesbit in his case violates his right to be free from *ex post facto* laws. See generally Tenn. Const. Art. I, § 11. Both the United States Constitution, in Article I, sections 9 and 10, and the Tennessee Constitution, in Article I, section 11, forbid the passage of any *ex post facto* law by Congress or the General Assembly. See State v. Rogers, 992 S.W.2d 393, 401 (Tenn. 1999), cert. granted, 529 U.S. 1129, 120 S. Ct. 2004 (2000). The United States Supreme Court has extended the constitutional provisions to not only apply to acts of Congress, but also to apply to any "judicial construction of a criminal statue [that] is unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue." Rogers, 992 S.W.2d at 402 (citing Bouie v. City of Columbia, 378 U.S. 347, 354, 84 S. Ct. 1697, 1703 (1964) (internal quotations and citations omitted)); accord Marks v. United States, 430 U.S. 188, 191-192, 97 S. Ct. 990, 992-93 (1977).

An *ex post facto* law within the meaning of the federal and state constitutions has been defined as one that

> makes an action done before the passing of the law, and which was innocent when done criminal; and punishes such action. Second, every law that aggravates a crime, or makes it greater than it was when committed. Third, every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. **Fourth, every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender**.

Rogers, 992 S.W.2d at 401-402 (citing Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798); see also State v. Pearson, 858 S.W.2d 879, 881 (Tenn. 1993); Miller v. State, 584 S.W.2d 758, 761 (Tenn. 1979)(adopting the categories identified in Calder and stating that "every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage" constitutes an *ex post facto* law)) (emphasis added); see also Carmell v. Texas, – U.S. –, 120 S. Ct. 1620, 1627 (2000); State v. Bragan, 920 S.W.2d 227, 241 (Tenn. Crim. App. 1995). An *ex post facto* law contains two critical elements: (1) the law must apply to events occurring before its enactment and (2) it must disadvantage the offender affected by it. See State v. Ricci, 914 S.W.2d 475, 480 (Tenn. 1996); see generally State v. Rickman, 972 S.W.2d 687, 693 (Tenn. Crim. App. 1997).

The rule announced in State v. Nesbit is neither an unexpected nor unforeseen judicial construction of a principle of criminal law. As the Nesbit court acknowledged, prior to the Nesbit decision, evidence about the *nature and circumstances of the crime* was admissible in a capital

sentencing hearing regardless of the fact that "the proof is not necessarily related to a statutory aggravating circumstance." Nesbit, 978 S.W.2d at 890 (citing Harris, 919 S.W.2d at 331; Teague, 897 S.W.2d at 251; Nichols, 877 S.W.2d at 731; Bigbee, 885 S.W.2d at 813). The rule announced in Nesbit merely clarified existing practice in admitting victim impact testimony and established specific guidelines to be followed in admitting such testimony. Moreover, the United States Supreme Court has consistently held that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute *ex post facto* laws. See Carmell v. Texas, – U.S. at –, 120 S. Ct. at 1632-1633; Bragan, 920 S.W.2d at 241 (citing Thompson v. Missouri, 171 U.S. 380, 18 S. Ct. 922 (1898); Hopt v. Utah, 110 U.S. 574, 4 S. Ct. 202 (1884)). Indeed, laws which change rules of procedure but which do not affect any substantial right of a defendant are not *ex post facto laws.* Bragan, 920 S.W.2d at 241. Victim impact testimony does not reduce the quantum of evidence necessary to return a death sentence. Victim impact testimony does not eliminate the necessity of finding the presence of a statutory aggravating circumstance(s) nor does it eliminate the necessity of finding that the aggravator(s) outweigh any applicable mitigating circumstances. Finally, victim impact testimony does not lower the burden of the State's proof. For these reasons, Nesbit's application to the Appellant's case does not violate the Appellant's right to be free from *ex post facto* laws. Additionally, we note that, although the offenses in the present case occurred prior to the court's decision in Nesbit, it is undisputed that the Nesbit ruling was established prior to the Appellant's trial. See generally State v. Pilkey, 776 S.W.2d 943, 945 (Tenn. 1989), cert. denied, 494 U.S. 1046, 110 S. Ct. 1510 (1990) (trial occurred after effective date of statute authorizing use of ex parte videotaped statement of child victim, thus, no *ex post facto* claim). This claim is without merit.

### B. Victim Impact Evidence Irrelevant within Capital Sentencing Structure

Next, the Appellant avers that victim impact testimony is irrelevant within the capital sentencing structure established by Tenn. Code Ann. § 39-13-204(g)(1) and State v. Nesbit, 978 S.W.2d at 892. Essentially, he asserts that a contradiction exists between Tenn. Code Ann. § 39-13-204(g)(1) and the victim impact jury instruction promulgated in Nesbit. He concludes that this contradiction necessarily renders victim impact evidence irrelevant.

Tenn. Code Ann. § 39-13-204(g)(1) provides:

If the jury unanimously determines that

(A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and

(B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt; then the sentence shall be death.

The instruction promulgated by the supreme court and suggested for use in all capital murder cases in which victim impact evidence is admitted provides:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.

> Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

State v. Nesbit, 978 S.W.2d at 892. The statute directs that once the jury has found the existence of an aggravating circumstance beyond a reasonable doubt and that the aggravating circumstance(s) outweighs any mitigating circumstances, the jury shall return a verdict of death. The Nesbit instruction tells the jury that it may not consider victim impact evidence until after it has found that at least one aggravating circumstance exists, and that the aggravating circumstance(s) outweighs the mitigating circumstances beyond a reasonable doubt. Essentially, the Appellant concludes that "the role of victim impact evidence has been mooted" and serves no purpose in the sentencing scheme.

The State is correct in its assertion that the jury charge provided in the instant case was that charge mandated by the supreme court in Nesbit. See Nesbit, 978 S.W.2d at 892. As an intermediate appellate court, this court has a duty to apply the law as promulgated by our Legislature or as announced by our supreme court. We are without the authority to overrule the holdings of our supreme court. See Reimann v. Huddleston, 883 S.W.2d 135, 137 (Tenn. App. 1993), cert. denied, 513 U.S. 825, 115 S. Ct. 91 (1994). Notwithstanding, the Appellant, again, argues that the victim impact instruction "moots" the use of victim impact testimony. Accrediting the Appellant's argument, we are unable to discern the extent to which the Appellant is detrimentally affected.[21] A defendant may not complain of error which benefits him. See State v. Carter, 714 S.W.2d 241

---

[21]We reject the Appellant's argument that the jury would more likely than not disregard the court's instructions and improperly consider victim impact evidence to the Appellant's prejudice. The Appellant has failed to offer any plausible reason for this court to conclude that the jury would summarily disregard the court's instruction.

(Tenn. 1986), <u>cert. denied</u>, 479 U.S. 1046, 107 S. Ct. 910 (1987). The Appellant has failed to demonstrate any resulting prejudice. The issue is overruled.

### C. Admission of Victim Impact Testimony

The Appellant's challenge to the introduction of victim impact evidence is limited to the testimony of Gina Jackson, Wayne Jackson, Jerry Jackson, and Deanna Hampton. The victim impact testimony complained of is as follows:

1. Gina and Wayne Jackson both testified that they knew that Sarah had suffered and was afraid. The Appellant contends that this testimony does not address any "unique characteristics" about the victim, but rather, it offers "characterizations and opinions about the crime."

2. Gina Jackson testified that she believed that her daughter, Sarah, was safe while working at Captain D's. The Appellant contends that this testimony does not address any "unique characteristics" about the victim, nor any other relevant aspect of victim impact evidence. Instead, it is more akin to a comment on the circumstances of the crime, and it is substantially more prejudicial than probative.

3. Deanna Hampton testified that her young daughter had asked her who would walk her down the aisle. Jerry Jackson commented that it was difficult for him to see other fathers march their children down the aisle at weddings. The Appellant contends that this testimony was "extremely emotional testimony," but "only marginally relevant to the emotional impact of the crimes upon certain family members."

4. Gina Jackson testified that at family celebrations they would set out a picture of Sarah and light a candle in her memory. The Appellant contends that this testimony is "very emotionally wrenching, and its prejudicial effect greatly outweighs its probative value."

5. Jerry and Wayne Jackson both testified as to the overwhelming guilt felt by both Jerry and Gina Jackson over their daughter's murder. The Appellant contends that "[t]his is yet another example of testimony that is properly characterized as emotional or psychological impact evidence." "[Its] prejudicial effect was substantially outweighed by its probative value (sic). The trial court should have excluded it due to the danger that it would create undue prejudice against the [Appellant], thereby creating fundamental unfairness during the sentencing hearing."

6. Deanna Hampton testified about how her three-year-old son did not want to celebrate his birthday a year after the murders, because he associated his birthday with his father's death. She also testified that her husband, Steve, was a good father. Jerry Jackson testified that Sarah was very intelligent and had a lot of potential. Wayne Jackson testified that he cannot accept what his sister went through, there was

-48-

not reason for her to suffer. The Appellant contends that this testimony had not been part of the jury-out hearing and was unduly prejudicial.

In Nesbit, our supreme court determined that "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Nesbit, 978 S.W.2d at 891 (citations omitted). The victim impact evidence complained of by the Appellant is clearly of the nature contemplated in Nesbit. See generally Smith, 993 S.W.2d at 17. The fact that the death of a loved one is devastating requires no proof. See Morris, 24 S.W.3d at 813 (Appendix). Moreover, although the testimony at the sentencing hearing may not be verbatim to that offered at the jury-out hearing, the testimony offered was not different in kind or scope from that offered at the jury-out hearing. Accordingly, we cannot conclude that the admission of the victim impact testimony was unduly prejudicial. This issue is without merit.

### D. Prosecutor's Closing Argument

The Appellant also contends that the prosecutors engaged in improper closing argument regarding the function of victim impact evidence upon the jury. Accordingly, he argues that the trial court erred by failing to grant a mistrial. Specifically, the Appellant asserts:

1. The prosecutor improperly instructed the jury that they were to consider the victim impact evidence in relation to the impact the victims' deaths had to both the community and their families.

2. The prosecutor impermissibly asked the jury "to show [the Appellant] the same mercy that he showed to Steve and Sarah. Absolutely none."

3. The State's closing argument misrepresented to the jurors that they should consider the victim impact evidence during the weighing process, and not after they have completed the weighing process, as Nesbit instructs.

As previously stated, the decision of whether to grant a mistrial is within the sound discretion of the trial court. See McKinney, 929 S.W.2d at 405. "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." Millbrooks, 819 S.W.2d at 443. In reviewing a trial court's denial of a motion for mistrial, this court will not disturb that decision unless there is an abuse of discretion. Adkins, 786 S.W.2d at 644; State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

As asserted by the State, the Appellant failed to make a contemporaneous objection to the prosecutor's comments that the jury could consider what the victim's death "meant to the community" and that the jury should "show [the Appellant] the same mercy that he showed to Steve and Sarah." See State v. Green, 947 S.W.2d 186 (Tenn. Crim. App. 1997); State v. Little, 854

S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives later complaint). The failure to object to the prosecutor's statements results in waiver on appeal. See generally State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)). Because these complaints are procedurally defaulted, we decline review of the merits.[22]

The Appellant also contends that, during rebuttal closing argument, the prosecutor improperly argued to the jury how it was to weigh the victim impact evidence in relation to the mitigation evidence offered by the Appellant in direct violation of the supreme court's mandate in State v. Nesbit, 978 S.W.2d at 894. Indeed, in Nesbit, our supreme court cautioned that victim impact evidence "does not carry the force of and effect of an aggravating circumstance in the sentencing calculation." Nesbit, 978 S.W.2d at 894. Accordingly, victim impact evidence may not be classified as such and the jury may not be instructed to weigh and balance the victim impact evidence against mitigating proof. Id.

The challenged argument and the Appellant's objection follows:

GENERAL THURMAN: Aggravating circumstances. We've talked about those. General Moore talked about them, and they are really not an issue. Mr. Engle admits that all those aggravating circumstances are present in this case, so that is not the issue now.
Now you have the weighing issue, and if you weigh what we've talked about, if you weigh it, any mitigation you found for Mr. Reid, and I submit it is very slight, I think there is but one verdict under the law. You weigh it in your mind. What is the verdict?
When you weigh it, **I want you to consider the facts about these aggravating circumstances**, the facts that this is a robbery, the facts that they were killed in cold blood because they were witnesses. You've seen that picture a lot, but when **you weigh the circumstances of this crime, you have to think what was in Steve Hampton's mind, when he was shot and when he was still alive and was reaching up?** What was he thinking in the last few seconds? And you weigh that against the mitigation.
Sarah Jackson - -

MR. ENGLE: Objection, Your Honor, you cannot, the law doesn't allow the weighing of the facts of the crimes as against the mitigating evidence.

THE COURT: Sustained. Rephrase.

_____

[22]Although the issue is waived, we acknowledge that this court has previously found that "the State went beyond the bounds of acceptable argument by telling the jury to show the petitioner the same mercy that he had shown his victim." See Harold Wayne Nichols v. State, No. E1998-00562-CCA-R3-PD (Tenn. Crim. App. at Knoxville, Jan. 19, 2001) (citing Bigbee, 885 S.W.2d at 811). Notwithstanding, this court held that "these improper comments [did not amount to] reversible error." Id.

GENERAL THURMAN: **They can consider all the facts and circumstances of the crime, which I'm asking.**

THE COURT: They can consider. I will – ladies and gentlemen of the jury, I will instruct you as to how you are to weigh things.

GENERAL THURMAN: But you can consider that. **You consider what Sarah Jackson had to go through in considering these aggravating factors**, after she was shot, after she had to wait knowing Steve Hampton was being shot, and she was next, and how after she was shot, she was struggling to get up, thinking maybe, maybe I've survived, maybe he is gone, and when you are weighing his background, his childhood, **weigh what kind of man could stand there and calmly reload, one shell at a time, in that pistol while she is struggling there, and what kind of man cannot have pity, and what kind of man did walk in there an execute that young girl**?

This kind of man, and he can't blame his mother. He can't blame his father. He can't blame the Texas Department of Correction. He is responsible. This man. That is the man the expert witnesses for the defense didn't want you to see. That is the man that suffered from this psychosis that can't hardly deal with the world. That is the man. Paul Reid celebrating, spending his money, shopping. It looks like he is functioning pretty well; doesn't it? **While he is toasting his margarita and you are weighing the circumstances, think about the three children that are saying where is my daddy? Think about the parents struggling to get through one more day while he is celebrating.**

**Now even though a lot of this case is about Paul Reid and the mitigation that you have to consider, you don't have to forget those faces, those lives, and the lives that were destroyed, besides those two, of the families. The Judge will tell you you can consider that. You consider that when you weigh those aggravating circumstances. They were real people with real dreams** - -

MR. ENGLE: Your Honor, I'm sorry, but, again, this is a misstatement of the law.

GENERAL THURMAN: It is not a misstatement of the law. They can consider that, Your Honor.

THE COURT: Consider it – I will instruct the jury in terms of how they should consider this.

GENERAL THURMAN: But don't forget all the lives, not only theirs, that were destroyed by Paul Reid, and it's time for him to face the responsibility for that. It's

time for him to have the ultimate punishment. Each of you know what that is. It's time for justice. Thank you.

(Emphasis added). Out of the presence of the jury, the Appellant then moved for a mistrial based upon (1) photographs of the victims lying in the restaurant cooler being displayed during closing argument; (2) the statement that the jury, when weighing the circumstances, could consider "what she [Sarah Jackson] was thinking, what she had to go through"; (3) the statement that the jury, when weighing the circumstances, could "think about the three children who are asking where is my daddy"; and (4) the statement that the jury could, when weighing the aggravating circumstances, "weigh what kind of man would execute these people." In essence, the Appellant argued that "the State's argument misrepresented to the jurors that they should consider the victim impact evidence <u>during</u> the weighing process, and not after they have completed the weighing process, as <u>Nesbit</u> instructs." Appellant's Brief at 279 (emphasis added).

The trial court denied the motion, concluding that (1) the photographs of the victims were evidence and could be used in closing argument and (2) the prosecutor never argued that the jury could weigh victim impact evidence in determining the existence of aggravating circumstances.[23] The court clarified its ruling by explaining that the court would instruct the jury that

> [y]ou may consider this victim impact evidence in determining the appropriateness of the death penalty or life without the possibility of parole only if you first find the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt, so the charge does include that statement, so they consider it for whatever they want to consider it for.

In evaluating the prejudicial effect of the prosecutor's statement upon the verdict, we must consider:

> 1. The conduct complained of viewed in light of the facts and circumstances of the case;
> 2. The curative measures undertaken by the court and the prosecution;
> 3. The intent of the prosecutor in making the improper arguments;
> 4. The cumulative effect of the improper conduct and any other errors in the record; and
> 5. The relative strength and weakness of the case.

<u>Nesbit</u>, 978 S.W.2d at 894. Any impropriety in the prosecutor's closing argument is slight. In fact, the only improper statement is the statement that "**You consider that when you weigh those**

---

[23]The court subsequently modified its ruling, finding that the argument was improper at times when the prosecutor implied "that the jury could 'weigh' the victim impact testimony as opposed to just 'considering' it."

**aggravating circumstances.  They were real people with real dreams** –." Though the prosecutor mischaracterized the function of victim impact evidence, there is no indication that the prosecutor acted in bad faith.  See generally Nesbit, 978 S.W.2d at 894.  Moreover, the jurors were properly instructed by the trial court regarding the function of victim impact evidence and that the jury was to apply the law as provided by the court.  Id.; see also State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995), 519 U.S. 826, 117 S. Ct. 88 (1996) (jury presumed to follow the instructions of the court). With consideration of this mischaracterization of the function of victim impact testimony, the curative measure of the trial court, and the strength of the aggravating circumstances proven by the State, we cannot conclude that the improper argument by the State affected the verdict to the Appellant's prejudice.  See generally Nesbit, 978 S.W.2d at 894.  Therefore, the error does not require reversal.


## X.  Use of Felony Murder Aggravating Circumstance

The jury returned verdicts finding the Appellant guilty of both premeditated murder and felony murder.  The trial court properly merged the verdicts into one count of first-degree murder. At the subsequent sentencing hearing, the State proceeded to the penalty phase intending to prove the felony murder aggravating circumstance, Tenn. Code Ann. § 39-13-204(i)(7).  The Appellant's objection was overruled and the State was permitted to use the (i)(7) aggravator.  The jury subsequently found the aggravating circumstance applied beyond a reasonable doubt.

In State v. Carter, 958 S.W.2d 620, 624 (Tenn. 1997), our supreme court approved the use of the felony murder aggravating circumstance to a general verdict of first-degree murder.  While acknowledging the decision in State v. Carter, 958 S.W.2d at 624, the Appellant contends that the court erred by permitting the State to rely on the felony murder aggravating circumstance to seek a sentence of death because the use of the (i)(7) factor "violates the principles of death-sentencing as outlined by the Tennessee Supreme Court in Middlebrooks."[24]   Essentially, the Appellant invites this court to overrule our supreme court's decision in State v. Carter and adopt the position that the use of the felony murder aggravating circumstance in any case where the defendant is convicted of felony murder is unconstitutional.  We decline to do so.

---

[24]We note that both the State and the Appellant acknowledge the legislature's response to Middlebrooks in its 1995 amendment to the (i)(7) aggravator.  The amended aggravator is applicable where the murder "was *knowingly* committed, solicited, directed, or aided by the defendant, while the defendant had a *substantial* role in committing or attempting to commit [a specific enumerated felony]." Tenn. Code Ann. § 39-13-204(i)(7) (emphasis added).  This court has concluded that the amended aggravator, even applied in cases where the sole verdict is that of felony murder, sufficiently narrows the class of death-eligible defendants, thereby creating no Middlebrooks problem.  See State v. James P. Stout, No. 02C01-9812-CR-00376 (Tenn. Crim. App. at Jackson, Feb. 20, 2000), perm. to appeal granted, (Tenn.).  The Appellant disputes this court's review of the amended statute, arguing that the Middlebrooks analysis is still applicable even with the current language.  We find no sound reason to overrule this court's holding in State v. James P. Stout.

-53-

## XI.  Failure to Instruct on Non-Statutory Mitigators

During the penalty phase of the trial and acting pursuant to statutory authority, the Appellant filed a request for non-statutory mitigating circumstances to be included in the jury charge. Specifically, the non-statutory mitigating circumstances asserted in the request were:

1. Mr. Reid suffers from brain damage.
2. Mr. Reid sustained several brain injuries as a child.
3. Mr. Reid never received adequate treatment for his brain injuries as a child.
4. Mr. Reid has not received adequate treatment for his brain injuries as an adult.
5. Mr. Reid was born with a deformed ear, along with a hearing impairment.
6. Mr. Reid never received adequate medical treatment for his deformed ear and resulting hearing impairment.
7.  Mr. Reid suffers from the specific mental illness of schizophrenia.
8.  Mr. Reid is unaware that he suffers from schizophrenia.
9.  Mr. Reid has never received adequate medical treatment for his schizophrenia.
10.  At the time of the offenses, Mr. Reid was not involved in any course of treatment for his schizophrenia.
11.  At the time of the offenses, Mr. Reid was not taking any medication to control his schizophrenia.
12.  When Mr. Reid was released from prison in Texas, he was not placed on any plan of follow-up medical care for his schizophrenia.
13.  As a child, Mr. Reid lacked substantial guidance, discipline, and love from his parents.
14.  Mr. Reid's parents were divorced when he was still very young.
15.  Mr. Reid was taken from his mother's care at a very early age.
16.  Mr. Reid's father was absent a great deal during his early childhood years.
17.  Mr. Reid did not start school until he was almost seven years old.
18.  Mr. Reid was placed in a boys' home at age eight.
19.  Mr. Reid was a social outcast as a child.
20.  Throughout his childhood years, Mr. Reid had only sporadic school attendance.
21.  As a child, Mr. Reid was aware of his sister's sexual abuse at the hands of one of his stepfathers.
22.  Mr. Reid lacked any substantial family support as a child, and he continues to lack that support as an adult.
23.  In spite of his brain damage, mental illness, and difficult childhood, Mr. Reid has tried to lead a normal lifestyle.
24.  Mr. Reid has made efforts to better himself.
25.  Mr. Reid obtained his GED, and he then attended college at age 39.
26.  In his daily tasks, Mr. Reid is polite and courteous to others.
27.  STRICKEN
28.  Mr. Reid does well in a structured environment, such as prison.
29.  Mr. Reid's convictions in this case were based upon circumstantial evidence.

The trial court denied the Appellant's request to instruct the jury verbatim to the proposed instruction. Instead, the trial court, relying upon State v. Odum and State v. Hodges, found that a verbatim reading of the Appellant's instruction would amount to an unconstitutional comment upon the evidence. The trial court, instead, instructed the jury on the requested mitigators in general categories, including:

    3. History of childhood.
    4. Mental illness or mental or emotional disturbance.
    5. Brain injury or damage.
    6. Educational history.
    7. Performance in a structured environment.
    8. Family history and relationships.

In addition to instructions on specific statutory mitigating circumstances and the above mentioned non-statutory mitigating circumstances, the court provided the jury the following:

    9. Any aspect of the defendant's background or character which [you] believe reduces the defendant's blameworthiness.

    10. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The Appellant complains that the court committed reversible error in refusing to instruct the jury on the specific non-statutory mitigating circumstances set forth in his request. He additionally contends that the manner in which the trial court instructed the jury regarding non-statutory mitigating circumstances did not adequately define for the jury the mitigating evidence presented.

In State v. Odom, 928 S.W.2d at 31, the supreme court determined that:
The jury instructions [on mitigating circumstances] are critical in enabling the jury to make a sentencing determination that is demonstrably reliable. To ensure this reliability, the jury must be given specific instructions on those circumstances offered by the capital defendant as justification for a sentence less than death.

The court then recognized the importance of instruction on non-statutory mitigating circumstances as well as on statutorily enumerated mitigating circumstances. See generally Odom, 928 S.W.2d at 31 (citing Tenn. Code Ann. § 39-13-204(e)(1) (no distinction shall be made between statutory mitigators and those raised by the evidence)). However, the supreme court explained that instructions on non-statutory mitigating circumstances must not be fact specific and imply to the jury that the judge had made a finding of fact in contravention of Article VI, section 9 of the Tennessee Constitution. See Odom, 928 S.W.2d at 32 (court recognized risk of instruction amounting to

unconstitutional comment upon evidence); see also State v. Hodges, 944 S.W.2d 346, 356 (Tenn.), cert. denied, 522 U.S. 999, 118 S. Ct. 567 (1997). Instead, the instructions on non-statutory mitigating circumstances must be "drafted so that when they are considered by the jury, the statutory mitigating circumstances are indistinguishable from the non-statutory mitigating circumstances." Odom, 928 S.W.2d at 32. In essence, an instruction on a non-statutory mitigating circumstance must be phrased in general categories similar to the statutory mitigating circumstances. See, e.g., Hodges, 944 S.W.2d at 355-356; Odom, 928 S.W.2d at 33.

Again, the Appellant essentially complains that the trial court's lack of specificity and instruction in general categories defeated the purpose of the instructions and did not convey a fair picture of the mitigation proof. This identical argument was rejected by our supreme court in State v. Hodges, 944 S.W.2d at 356. In Hodges, the defendant argued that the trial court erred by denying his requested instructions on non-statutory mitigating circumstances. Hodges, 944 S.W.2d at 351. Instead, the trial court had instructed the jury on the following non-statutory mitigating circumstances: history of childhood; victim of child sex abuse; mental illness or mental or emotional disturbance; dominance by another person and/or immaturity; drug abuse; and any other aspect of the defendant's background or character or the circumstances of the offense, which would reduce the defendant's blameworthiness. Id. at 355. In reviewing the instructions on mitigating circumstances, the supreme court emphasized that a jury instruction on mitigating circumstances can be found "prejudicially erroneous" only if "it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Hodges, 944 S.W.2d at 352. The court observed that " '[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.' " Id. at 352 (quoting Boyde v. California, 494 U.S. 370, 380-81, 110 S. Ct. 1190 (1990)). Our supreme court explained:

> Jurors interpret the instructions in a common sense manner and in light of the evidence presented at the trial. The defense assertion ignores the reality that these jurors had heard specific evidence during the sentencing hearing about the defendant's childhood, his immaturity, alleged sexual abuse, drug abuse, mental illness and emotional disturbance, as well as the dominance by Tina Brown. By their breadth, the instructions on non-statutory mitigating circumstances encompassed all the evidence presented by the defense at the sentencing hearing . . . . [T]he defendant's claim of error is without merit.

Hodges, 944 S.W.2d at 356 (citations omitted). While the instructions specifically requested by the defendant were not given, other instructions, as enumerated above, were provided to the jury, which "encompassed all the evidence" the defendant presented. Id.; see also Brimmer v. State, 29 S.W.3d 497, 520-521 (Tenn. Crim. App. 1998).

In the instant case, the trial court clearly followed the directives of Odom and the example provided in Hodges. We conclude that the instructions provided by the trial court were substantially the same as those requested by the Appellant and that the instructions fairly submitted to the jury the legal issues. See, e.g., Hodges, 944 S.W.2d at 356; State v. Rudolph Munn, No. 01C01-9801-CC-

00007 (Tenn. Crim. App. Apr. 1, 1999), <u>perm. to appeal granted</u>, (Tenn. Nov. 9, 1999). Accordingly, the trial court's refusal to instruct the jury as to the proffered non-statutory mitigating circumstances was not error. This claim is without merit.

## XII.  Sentence for Especially Aggravated Robbery

Following a sentencing hearing, the trial court sentenced the Appellant, as a Range I standard offender, to twenty-five years for the especially aggravated robbery conviction. The trial court further ordered that the sentence be served consecutively to the death sentences imposed in this case and consecutively to a sentence in Texas for which the Appellant was on parole at the time the offense was committed. On appeal, the Appellant argues that the trial court erred by imposing the maximum sentence for the especially aggravated robbery conviction and erred in ordering the especially aggravated robbery conviction to run consecutively to his death sentences.

The Appellant bears the burden of establishing that the sentence imposed by the trial court was erroneous. <u>State v. Ashby</u>, 823 S.W.2d 166, 168 (Tenn. 1991); <u>State v. Boggs</u>, 932 S.W.2d 467, 473 (Tenn. Crim. App. 1996); <u>State v. Fletcher</u>, 805 S.W.2d 785, 786 (Tenn. Crim. App. 1991). Appellate review of a sentence is *de novo*, with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d) (1997); <u>Ashby</u>, 823 S.W.2d at 169. In determining whether the Appellant has carried the burden, this court must consider the evidence received at the trial and the sentencing hearing, the pre-sentence report, the principles of sentencing, the arguments of counsel, the nature and characteristics of the offenses, existing mitigating and enhancing factors, statements made by the offender, and the potential for rehabilitation. Tenn. Code Ann. § 40-35-210 (Supp. 1998); <u>Ashby</u>, 823 S.W.2d at 169.

### *A.  Enhancement Factors*

Especially aggravated robbery is a class A felony. Tenn. Code Ann. § 39-13-403(b). As a Range I standard offender, the sentencing range for especially aggravated robbery is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (1997). The trial court sentenced the Appellant to the maximum sentence of twenty-five years for the especially aggravated robbery conviction. During sentencing, the trial court applied the following seven enhancement factors:

1. The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

3. The offense involved more than one victim.

5. The defendant treated or allowed a victim to be treated with exceptional cruelty.

10.     The defendant had no hesitation about committing a crime when the risk to human life was high.

12.     During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or person other than the intended victim.

13(B).  The felony was committed while on any of the following forms of release if such release is from a prior felony conviction . . . parole.

16.     The crime was committed under circumstances under which the potential for bodily injury to the victim was great.

Tenn. Code Ann. § 40-35-114(1), (3), (5), (10), (12), (13(b)), (16) (1997). Additionally, the trial court applied mitigating factor 8 based upon the Appellant's mental condition, and applied mitigating factor 13 based upon "the majority of the testimony" developed during the capital penalty phase, including the Appellant's childhood history and his family history. Tenn. Code Ann. § 40-35-113(8), (13) (1997). On appeal, the Appellant only challenges the trial court's application of enhancement factors (3), (5), (10), and (16).

First, the Appellant contests the application of enhancement factor (3), "that the offense involved more than one victim." Specifically, the Appellant contends that because only one victim, Steve Hampton, was named in the indictment upon which he was convicted of especially aggravated robbery that the other victim, Sarah Jackson, cannot also be considered a victim of especially aggravated robbery. The Appellant further argues that there was no evidence at trial to prove that the perpetrator ever robbed or attempted to rob Sarah Jackson. Thus, the Appellant asserts, the trial court's application of enhancement factor 3 was erroneous. When applying this factor, however, the trial court reasoned that Sarah Jackson was also a victim of the robbery. We agree.

This court has defined "victim," as used in Tenn. Code Ann. § 40-35-114(3), as being limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). This court has also held that factor (3) may not be applied to enhance a sentence when the Appellant is separately convicted of the offenses committed against each victim. State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995); see State v. Lambert, 741 S.W.2d 127 (Tenn. Crim. App. 1987). Accordingly, statutory enhancement factor (3) does not apply when there are separate convictions for each victim. State v. Freeman, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996). Because the Appellant was not convicted of separate offenses against each victim, and because Sarah Jackson was clearly a victim as defined in Raines, the trial court properly applied enhancement factor (3) during sentencing. This issue is without merit.

Second, the Appellant challenges the trial court's application of enhancement factor (5), that "the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." Specifically, the Appellant contends that "there is no evidence in the record suggesting that either of the victims were subjected to the type of torture that would justify the application of § 40-35-114(5)." At sentencing, the trial court applied factor (5) because there was evidence in the record that Sarah Jackson had moved after she was shot.

Tennessee Code Annotated section 40-35-114 provides that enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Accordingly, enhancement factors based on facts which are used to prove the offense or which establish the elements of the offense are excluded. State v. Poole, 945 S.W.2d 93, 98 (Tenn.1997). Moreover, because "exceptional cruelty" is inherent in some offenses such as aggravated assault, the facts must demonstrate a culpability distinct from and greater than that incident to the offense. Id. "Exceptional cruelty," when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged. Thus, cruelty requires more than the physical infliction of serious bodily injury upon a victim.

We first note that "exceptional cruelty" is not an element of especially aggravated robbery. Tenn. Code Ann. § 39-13-403(a)(2); Poole, 945 S.W.2d at 98. Moreover, proof of serious bodily injury, which is an element of especially aggravated robbery, does not necessarily establish the enhancement factor of "exceptional cruelty." Poole, S.W.2d at 98. Exceptional cruelty is usually found in cases of abuse or torture. State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

This court has recognized that "exceptional cruelty" is a matter of degree. State v. Moore, No. 02C01-9306-CC-00126 (Tenn .Crim. App. at Jackson, Jun. 8, 1994). In this regard, we first note that the taking of a life is not necessary to accomplish the offense of especially aggravated robbery. Additionally, the proof in this case established that the Appellant forced the victims onto the floor in the walk-in cooler. The anguish experienced by the victims at this point while they awaited their execution is unfathomable. Based upon the manner in which this crime was committed, and its consequences, we find that the Appellant's conduct established not only the infliction of serious bodily injury but also a calculated indifference toward suffering. Thus, we find application of enhancement factor (5) appropriate.

Finally, the Appellant challenges the trial court's application of enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, and enhancement factor (16), that the crime was committed under circumstances under which the potential for bodily injury to the victim was great. Specifically, the Appellant argues that neither enhancement factor can apply because both are factors inherent to the offense of especially aggravated robbery.

With respect to enhancement factor (10), risk to human life is an essential element of the crime of especially aggravated robbery and cannot be used to enhance sentencing when the person

facing danger is the named victim. See Tenn. Code Ann. § 40-35-114; State v. Nox, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1998). However, this court has held that enhancement factor (10) may be applied where the defendant creates a high risk to the life of a person other than the named victim. State v. Bingham, 910 S.W.2d 448, 452-53 (Tenn. Crim. App. 1995). We conclude that the presence of Sarah Jackson, who was not named in the indictment, during the robbery of Steve Hampton created a high risk to her life, which ultimately and unfortunately resulted in her death. Accordingly, the trial court properly applied enhancement factor (10). Enhancement factor (16), however, is inapplicable to the offense of especially aggravated robbery as bodily injury is an element of the offense. Nix, 922 S.W.2d at 903. Thus, the trial court erroneously applied factor (16). Notwithstanding the erroneous application of enhancement factor (16), we believe that the remaining six enhancement factors balanced against the two mitigating factors, fully support the maximum twenty-five year sentence imposed by the trial court.

## B. Consecutive Sentencing

The Appellant next argues that the trial court erred by ordering the especially aggravated robbery conviction to be served consecutively to the death sentences imposed in this case. Specifically, he asserts that "a sentence to be served consecutively to a sentence of death is not the least severe sentence necessary to achieve the purposes for which the sentence is imposed." Our supreme court has consistently upheld sentences consecutive to a death sentence. See generally Morris, 24 S.W.3d at 788; State v. Pike, 978 S.W.2d 904, 928 (Tenn. 1998); State v. Black, 815 S.W.2d 166, 170 (Tenn. 1991). Thus, this issue is without merit.

## XIII. Constitutionality of Tennessee's Death Penalty Statutes

The Appellant raises a myriad of challenges to the constitutionality of Tennessee's death penalty provisions. The challenges raised by the Appellant have been previously examined and rejected by case law decisions. The body of law upholding the constitutionality of Tennessee's death penalty provisions, specifically that rejecting the claims currently raised by the Appellant, are recited as follows:

1. Tennessee's death penalty statutes meaningfully narrow the class of death eligible defendants; specifically, the statutory aggravating circumstances set forth in Tenn. Code Ann. § 39-13-204(i)(2), (i)(6), and (i)(7), whether viewed singly or collectively, provide a "meaningful basis" for narrowing the population of those convicted of first-degree murder to those eligible for the sentence of death. See Vann, 976 S.W.2d at 117-118 (Appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

2. The death sentence is not capriciously and arbitrarily imposed in that

(a) The prosecutor is not vested with unlimited discretion as to whether or not to seek the death penalty. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), cert. denied, 519 U.S. 847, 117 S. Ct. 133 (1996).

(b) The death penalty is not imposed in a discriminatory manner based upon economics, race, geography, and gender. See Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 23.

(c) Standards or procedures for jury selection exist to insure open inquiry concerning potentially prejudicial subject matter. See Caughron, 855 S.W.2d at 542.

(d) The death qualification process does not skew the make-up of the jury and does not result in a relatively prosecution prone guilty-prone jury. See Teel, 793 S.W.2d at 246; State v. Harbison, 704 S.W.2d 314, 318 (Tenn.), cert. denied, 470 U.S. 1153, 106 S. Ct. 2261 (1986).

(e) Defendants are not unconstitutionally prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.*, the cost of incarceration versus cost of execution, deterrence, method of execution. See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

(f) The jury is not instructed that it must agree unanimously in order to impose a life sentence, and is not prohibited from being told the effect of a non-unanimous verdict. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23.

(g) Requiring the jury to agree unanimously to a life verdict does not violate Mills v. Maryland and McKoy v. North Carolina. See Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), superseded by statute as recognized by, Hutchinson, 898 S.W.2d at161.

(h) The jury is required to make the ultimate determination that death is the appropriate penalty. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(i) The failure to instruct on "the meaning and function of" mitigating circumstances was considered in State v. Thompson, 768 S.W.2d 239, 251-52 (Tenn. 1989), and found not to constitute error.

(j) The defendant is not denied closing argument in the penalty phase of the trial. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. The appellate review process in death penalty cases is constitutionally adequate. See Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." See State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

4. Electrocution is a constitutionally permissible method of execution.[25] See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582.

## XIV.  Proportionality of Sentences of Death

Finally, this court is required to consider the imposition of the sentences of death in the instant case to determine whether: (1) the sentences of death were imposed in any arbitrary fashion; (2) the evidence supports the jury's finding of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. See Tenn. Code Ann. § 39-13-206(c)(1) (1997); see also State v. Vincent Sims, No. W1998-00634-SC-DDT-DD (Tenn. at Jackson, Apr. 17, 2001) (*for publication*). There is no dispute that the evidence is sufficient to support the three aggravating circumstances, *i.e.*, (2) the defendant was previously convicted of a violent felony, (6) the murder was committed for the purpose of avoiding arrest or prosecution, and (7) the murder was knowingly committed while the defendant had a substantial role in committing a robbery. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7). Additionally, having thoroughly reviewed the record, we find that the sentences of death were not imposed in any arbitrary fashion and that the evidence supports the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

Next, we consider whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). If the imposition of a death sentence in the appealed case is "plainly lacking in circumstances with those in similar cases in which the death penalty has previously been imposed," the sentence of death will be deemed disproportionate. See Bland, 958 S.W.2d at 665. However, just

---

[25]Recent legislation in this state has substituted death by lethal injection for death by electrocution. See Tenn. Code Ann. § 40-23-114 (1998 Supp.) (changes method of execution from electrocution to lethal injection for those persons sentenced to death after January 1, 1999). The new statute also provides that those persons sentenced to death prior to January 1, 1999, may choose to be executed by lethal injection by signing a written waiver. Hence, the Appellant's argument has not only been rejected by prior decisions but, now, also is irrelevant, as the capital defendant is no longer subjected to death by electrocution.

because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence does not *per se* require a finding of disproportionality. Id. at 665. Thus, it is not the duty of the appellate court to "assure that a sentence less than death was never imposed in a case with similar characteristics," but to "assure that no aberrant death sentence is affirmed." Id.

In conducting our review, we begin with the presumption that the sentence of death is proportionate with the crime of first-degree murder. See Hall, 958 S.W.2d at 699; see also State v. Vincent Sims, No. W1998-00634-SC-DDT-DD; State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000). Second, while there is no mathematical or scientific formula involved, this court, in comparing similar cases, should consider: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. See Vann, 976 S.W.2d at 107 (citing Bland, 958 S.W.2d at 667); see also State v. Vincent Sims, No. W1998-00634-SC-DDT-DD. When reviewing the characteristics of the defendant, we consider (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id.; see also State v. Vincent Sims, No. W1998-00634-SC-DDT-DD. Moreover, in conducting our review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Carruthers, 35 S.W.3d at 570 (citing Bland, 958 S.W.2d at 666) (emphasis added).

The circumstances surrounding the murders in light of the relevant and comparative factors reveal that, on Sunday morning, February, 16, 1997, the Appellant entered a Nashville Captain D's restaurant when it was closed. Once inside the restaurant, the Appellant murdered the employees he encountered inside, *i.e.*, twenty-five-year-old Steve Hampton and sixteen-year-old Sarah Jackson. There is no indication that either victim resisted or attempted to flee. Rather, the evidence revealed that both victims were discovered lying face down on the floor inside the restaurant's walk-in cooler. Sarah Jackson had been shot at close range four times in the back of the head and once in the back. Steve Hampton had been shot at close range twice in the back of the head and once in the back. Seven thousand one hundred forty dollars was taken during the robbery of the restaurant. The crimes were intentional, well-planned, and absent any indicia of impulse.

The thirty-nine-year-old Appellant had a prior 1984 conviction for one count of aggravated robbery in Texas. Additionally, in 1978, two felony indictments returned against the Appellant in Texas were dismissed based upon a finding of permanent incompetence. At this time, the Appellant was judicially committed to a psychiatric hospital. As a juvenile, the Appellant received probation for a theft and assault charge. The Appellant introduced testimony evidencing (1) that he had suffered through a terrible childhood and (2) that he suffered from mental and behavioral problems from a very early age. Although the proof established that the Appellant had either congenital or

traumatic brain damage, the proof did not establish that such brain damage is causally connected or predisposes one to commit acts of violence. Rather, the proof revealed that brain damage, such as that exhibited by the Appellant, does not contribute to criminal behavior. Additionally, although several mental evaluations of the Appellant indicated that he was schizophrenic and delusional, there was substantial evidence introduced of the Appellant's history of malingering and that the psychological disorder(s) were in remission at the time of the offenses. Finally, no evidence was presented to show that the Appellant cooperated with the authorities or showed any remorse for the killings. While no two capital cases and no two defendants are alike, we have reviewed the circumstances of the present case with similar first-degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. See, e.g., State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), cert. denied, – U.S. –, 121 S. Ct. 1367 (2001) (finding aggravating circumstances (i)(2) and (i)(7) and imposing death where defendant shot and robbed sixty-nine-year old victim); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), cert. denied, 523 U.S. 932, 119 S. Ct. 343 (1998) (a twenty-three-year-old defendant murdered female victim during robbery, death sentence upheld based upon (i)(2) aggravator); State v. Bush, 942 S.W.2d 489 (Tenn.), cert. denied, 522 U.S. 953, 118 S. Ct. 376 (1997)(finding (i)(5) and (i)(6) aggravating circumstances, and imposing death despite evidence that defendant had troubled childhood and mental disease or defect); Hines, 919 S.W.2d at 573 (finding (i)(2), (i)(5), and (i)(7) aggravating circumstances, and imposing death despite evidence that defendant had a troubled childhood, was abandoned by his parents, had abused drugs and alcohol as teenager, and suffered from self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); Shepherd, 902 S.W.2d at 895 (finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances in the rape and murder of sixteen-year-old victim, and imposing death despite fact that defendant came from impoverished family, was emotionally scarred as child, and was previously admitted to a mental health facility); Smith, 868 S.W.2d at 561 (finding the (i)(5), (i)(6), (i)(7), (i)(12) aggravating circumstances, and imposing death despite fact that defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis and paranoid delusional disorder); Howell, 868 S.W.2d at 238 (twenty-seven-year-old defendant shot and killed clerk during robbery of convenience store, death sentence upheld based upon (i)(2) aggravator); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (thirty-two-year-old defendant murdered two employees of hotel during robbery; jury imposed death sentences based upon (i)(2), (i)(5), and (i)(7) aggravating circumstances despite evidence of defendant's lack of education and troubled childhood); State v. King, 694 S.W.2d 941 (Tenn. 1985) (thirty-three-year-old defendant murdered the proprietor of a tavern during the course of a robbery, death sentence upheld based upon (i)(2) and (i)(7) aggravators); State v. Sample, 680 S.W.2d 447 (Tenn. 1984), cert. denied, 470 U.S. 1034, 105 S. Ct. 1412 (1985)(finding the (i)(3), (i)(6) and (i)(7) aggravating circumstances and imposing death penalty where two clerks shot to death during robbery); State v. McKay, 680 S.W.2d 447 (Tenn. 1984), cert. denied, 470 U.S. 1034, 105 S. Ct. 1412 (1985) (finding the (i)(2),(i)(3), (i)(6) and (i)(7) aggravating circumstances and imposing death penalty where two clerks shot to death during robbery); State v. Harries, 657 S.W.2d 414 (Tenn. 1983) (thirty-one-year-old male defendant shot and killed clerk during robbery of convenience store, death sentence upheld based upon (i)(2) aggravator).

Our review of these cases reveals that the sentences of death imposed upon the Appellant are proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and reach the decision that the sentences of death were not imposed arbitrarily, that the evidence supports the finding of the (i)(2), (i)(6) and (i)(7) aggravators, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate.

**Conclusion**

After a thorough review of the issues and the record before us, as mandated by Tenn. Code Ann. §§ 39-13-206(b), and (c), and for the reasons stated herein, we affirm the Appellant's convictions for two counts of first-degree murder and one count of especially aggravated robbery and accompanying sentences of death plus twenty-five years. In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentences of death were not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206(c)(1)(A),(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentences of death are neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the Appellant's convictions for two counts of first-degree murder and one count of especially aggravated robbery and the resulting sentences of death plus twenty-five years imposed by the trial court.

_____
DAVID G. HAYES, JUDGE